730 So.2d 958 (1998)
Yourick LAVINE, Jr., Mrs. Cynthia Lavine, and Harry Bonvillain
v.
Redgies JACKSON, Calvin Cooks, Mike Lawson, John Doe, City of Thibodaux, Thibodaux Police Dept. and Titan Indemnity Company.
No. 97 CA 2804.
Court of Appeal of Louisiana, First Circuit.
December 28, 1998.
Rehearing Denied February 26, 1999.
Writ Denied May 28, 1999.
*959 Gerald P. Aurillo, Metairie, for Plaintiffs-Appellants Yourick Lavine, Jr., Harry Bonvillain, Jr., and Mrs. Cynthia Lavine.
Redgies Jackson, LaPlace, In Proper Person.
Debra Fischman Cottrell, New Orleans, for Defendant-Appellee Calvin Cooks, et al.
Camille A. Morvant, II, Thibodaux, for Defendants-Appellees Calvin Cooks, Mike Lausen, City of Thibodaux, Titan Indemnity Company.
Before: FITZSIMMONS and GUIDRY, JJ., and REMY CHIASSON,[1] J. Pro Tem.
REMY CHIASSON, Judge Pro Tem.
Plaintiffs appeal from a judgment of the trial court in favor of defendants, finding no liability for injuries sustained as a result of an automobile accident which occurred during the pursuit of an alleged felon by police officers.

FACTS AND PROCEDURAL HISTORY
In the late afternoon on October 13, 1993, Michael W. Lausen, a deputy with the Thibodaux Police Department (Department), and Detective Calvin J. Cooks, were involved in a pursuit of an alleged felon, Redgies Jackson, that began in the Midland area of Thibodaux, Louisiana. This pursuit traversed approximately two and one-half miles, ending when Jackson traveled into the oncoming lane of traffic, colliding with a vehicle driven by Yourick Lavine, Jr.
On October 4, 1994, plaintiffs, Yourick Lavine, Jr., Cynthia Lavine, and Harry Bonvillain, Jr., a passenger in Mr. Lavine's vehicle, filed a petition for damages suffered as a result of this automobile accident in the Nineteenth Judicial District Court for the Parish of East Baton Rouge. In sum, plaintiffs alleged that the actions of the police officers in its pursuit of Jackson constituted negligence.
Named as defendants in the petition were Redgies Jackson; Calvin Cooks; Mike Lausen; John Doe, the chief of police for the Thibodaux Police Department; the City of Thibodaux; the Thibodaux Police Department; and Titan Indemnity Company, the liability insurer for the City of Thibodaux and the Thibodaux Police Department.
The petition was subsequently amended to name as defendants Norman Diaz, the Chief of Police for the City of Thibodaux on October 13, 1993, and/or Donald Bonvillain, the present Chief of Police.
All defendants except Jackson subsequently answered plaintiffs' petition, generally denying the allegations contained therein. These defendants also filed a cross-claim against Jackson, alleging that his negligence was the sole and proximate cause of the accident. Jackson filed an answer to this cross-claim in proper person.
On March 1, 1996, this matter was transferred to the Seventeenth Judicial District Court for the Parish of Lafourche pursuant to La. C.C.P. art. 123.
A trial was held on January 27-28, February 4, and March 17-18, 1997. The trial court subsequently rendered judgment on April 18, 1997, finding no liability on the part *960 of Lausen, Cooks, the City of Thibodaux, Norman Diaz, the Thibodaux Police Department and Titan Indemnity Company, and dismissing the action against them. The trial court found that the accident was caused solely by Jackson. The court rendered judgment in favor of Yourick Lavine, Jr. against Jackson for the following amounts:

Past and future pain and suffering $200,000.00
Disability and loss of enjoyment
 of life $100,000.00
Loss of wages to trial $ 68,000.00
Future loss of wages $100,000.00
Past medical expenses $119,297.00
Future medical expenses for
 psychiatric treatment $ 55,000.00

The trial court awarded Cynthia Lavine $10,000.00 for loss of consortium.
The trial court also rendered judgment in favor of Harry Bonvillain, Jr. against Jackson for the following amounts:

Past and future pain and suffering $65,000.00
Disability and loss of enjoyment
 of life $10,000.00
Wage loss to trial $ 7,100.00
Future loss of wages $20,000.00
Past medicals $19,053.00

Plaintiffs have appealed, alleging that the trial court erred as follows:[2]
1. In finding that the telephone call to Officer Cooks (and received by Officer Lausen) was from Rosalind Moore.
2. In finding that Officer Lausen and Officer Cooks did not break their duty to conduct himself/themselves in a manner that does not needlessly and recklessly endanger law abiding citizens, themselves, or the suspect being chased.
3. In finding that the reason Lausen and Cooks went to the Midland Street area was because Terrebonne Parish had an interest in Jackson.
4. In finding by a preponderance of the evidence that Jackson was the actual armed robber in the Morgan City robbery.
5. In finding that when Lausen went through the Highway 3185/3107 intersection, the accident involving Lavine and Jackson already had occurred.
6. In finding that Lausen and Cooks had a duty to pursue Jackson when Jackson exited the scene at a high rate of speed.
7. In considering for the basis of his judgment the fact the pursuit lasted one and one-half minutes.
8. In considering for the basis of his judgment the fact Lausen's or Cooks' vehicle did not collide with anyone.
9. In considering for the basis of his judgment the fact Lausen reduced his speed prior to entering the Highway 3185/3107 intersection.
10. In finding that plaintiffs/appellants failed to prove by a preponderance of the evidence that there was a breach of duty owed by Officer Lausen and/or Officer Cooks.
11. In finding that Lausen and/or Cooks did not place members of the general public in unnecessary danger as result of the conduct of their pursuit.
12. In finding that Lausen's not turning off his signals at the location of the fire station immaterial and irrelevant to the issue of fault on the part of the City of Thibodaux.
13. In failing to find that if Lausen and/or Cooks had terminated the pursuit of Jackson, Jackson would not have continued fleeing from them, and that the collision with Lavine would not have happened.
14. In finding no fault on the part of the City of Thibodaux, Officer Lausen, Officer Cooks, Sgt. Long, and Titan Indemnity Company.
15. In finding that the sole fault and/or cause of this accident and the injuries sustained by plaintiffs/appellants was the defendant, Jackson.
16. In failing to award Lavine an amount for impairment of earning capacity.
17. In failing to take necessary, proper, and adequate steps and action to where *961 Jackson would not be afraid he would be killed or sustain great bodily harm if he testified at the trial.
18. In failing to find that Lausen testified falsely when he testified he slowed down at the fire station and followed safely behind Jackson.
19. In failing to find that Cooks testified falsely when he testified that after he turned on to Talbot Street, he could not keep up with Lausen and Jackson, and that he, therefore, fell way behind.
20. In failing to find that Lausen and/or Cooks were negligent in initiating the pursuit of Jackson in the first place.
21. In failing to find that Lausen and/or Cooks were negligent for not terminating the pursuit at the location of the fire station.
22. In failing to find that Sgt. Long was negligent because of his lack of supervision during the pursuit and/or his failure to terminate the pursuit.
23. In failing to find the City of Thibodaux negligent for lack of training given to Lausen, Cooks, and/or Sgt. Long, and negligent under respondeat superior for Lausen's, Cooks', and Sgt. Long's acts of negligence.
24. In failing to find Titan Indemnity Company liable for the damages and injuries sustained by plaintiffs/appellants.
25. In failing to award plaintiffs/appellants adequate damages as against all defendants/appellees.
26. In failing to find that Lausen and Cooks were not driving "authorized" emergency vehicles during this pursuit once they left the city limits.

LAW
A court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). The supreme court has announced a two-part test for the reversal of the factfinder's determinations: (1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and (2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). Stobart v. State, Through Department of Transportation and Development, 617 So.2d 880, 882 (La.1993). The issue to be resolved by the reviewing court is not whether the trier of fact is right or wrong but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Through Department of Transportation and Development, 617 So.2d at 882. Where the testimony of expert witnesses differ, it is the responsibility of the trier of fact to determine which evidence is the most credible. Theriot v. Lasseigne, 93-2661, p. 9 (La.7/5/94), 640 So.2d 1305, 1313. The reviewing court must always keep in mind that if the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even if convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1112 (La.1990).
In order to determine whether liability exists under the facts of a particular case, the supreme court has adopted a duty-risk analysis. Under this analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Berry v. State, Through Department of Health and Human Resources, 93-2748, p. 4 (La.5/23/94), 637 So.2d 412, 414. Under the duty-risk analysis, all four inquiries must be affirmatively answered for plaintiff to recover. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94), 646 So.2d 318.

NEGLIGENCE OF OFFICER LAUSEN AND DETECTIVE COOKS
Plaintiffs allege that Officer Lausen and Detective Cooks were negligent in the manner in which they responded in the pursuit of the alleged felon, Jackson.
Generally, a police officer, in carrying out his authority to enforce laws, has the *962 duty to act reasonably to protect life and limb, to refrain from causing injury or harm, and to exercise respect and concern for the well being of those he is employed to protect. Syrie v. Schilhab, 96-1027, p. 5 (La.5/20/97), 693 So.2d 1173, 1177. Furthermore, with regard to operating an authorized emergency vehicle while responding to an emergency call, or when in pursuit of an actual or suspected violator of the law, a police officer has the duty to drive with due regard for the safety of all persons. La. R.S. 32:24(D).[3] Moreover, in effectuating an arrest, police officers have the duty to act reasonably, and the force used must be limited to that required under the totality of the circumstances; the reasonableness of an officer's actions depends upon the totality of the facts and circumstances of each case. Mathieu v. Imperial Toy Corporation, 646 So.2d at 322. Finally, an officer's actions need not be the "best" method of approach; instead, the standard of care requires choosing a course of action which is reasonable to the circumstances. Mathieu v. Imperial Toy Corporation, 646 So.2d at 322.
On the day of the accident, Officer Lausen testified that he was in the control room of the Department when an unidentified female called and said that a man named Redgies Jackson was in the Midland Drive area in a stolen vehicle. Officer Lausen further testified that the caller asked to speak to Calvin Cooks, who was a detective with the Thibodaux Police Department. Officer Lausen informed the caller that Detective Cooks had left for the evening. Officer Lausen called Detective Cooks and told him of the telephone call. Officer Lausen then went back to his marked unit to fill up with gasoline and, at this point, decided to head to the Midland Drive area which happened to be his area of patrol that day. Officer Lausen stated that he was travelling on South Barbier when Detective Cooks called him on the radio and inquired about his location. After informing Detective Cooks of his location, Officer Lausen stated that Cooks told him, "he's [Jackson] backing out of the driveway and he's going down Midland." Officer Lausen informed Detective Cooks that he was coming up on Bobby Street and Detective Cooks told him that he was traveling in that direction. Officer Lausen headed southbound on South Barbier and turned right on Bobby Street, which intersects with Midland. Detective Cooks then told Officer Lausen, "that's himthat's the carshut him down." It was at this point that Officer Lausen testified that he pulled his vehicle onto Bobby Street to block the intersection. Officer Lausen testified that he thought he turned on his emergency lights (which are the blue lights on the top of the unit) at that time. Officer Lausen stated that when he turned on his emergency lights, Jackson was traveling southbound on Midland, approaching Bobby Street; although he acknowledged that in the police report, he indicated that Jackson had already passed his vehicle when he turned on the lights. Officer Lausen testified that he left a little room for the vehicle to pass in the intersection after Detective Cooks told him to do so. Officer Lausen observed that one car would not block the *963 entire intersection. Officer Lausen stated that he gave the vehicle enough room so it could pass without ramming his car. Officer Lausen testified that Jackson approached his unit at this intersection travelling at approximately 30 miles per hour and was picking up speed as he approached the intersection. Detective Cooks' unmarked unit was behind Jackson as he proceeded down Midland Drive towards Bobby Street. Officer Lausen testified that once Jackson passed his unit at the intersection, he began his attempt to stop him.
Officer Lausen testified that, at this point, he called in a "Signal 18", which is a generic term for stopping a vehicle. Officer Lausen testified that he radioed his supervisor, Sergeant Roddy Long, when he initiated the pursuit.
According to Officer Lausen, Jackson then traveled towards St. Bernard where he took a left without stopping at the stop sign. Officer Lausen stated that he did not stop at the sign either, but slowed down to check for traffic. Officer Lausen estimated that he was traveling about 15 miles per hour at this point of the pursuit. After both vehicles turned onto St. Bernard, Officer Lausen stated that he activated his siren to pull over Jackson's vehicle, which was still picking up speed.
Officer Lausen testified that while following Jackson on St. Bernard, he recalled a "BOLO" that had been issued, referring to a white 4-door vehicle, that was stolen from Morgan City.[4] Officer Lausen further testified that the BOLO contained information that a black man was driving the vehicle and was possibly armed. In light of this recollection, Officer Lausen called in the license plate number but could not get a confirmation because the computer was down.
Officer Lausen observed that while traveling on St. Bernard, Jackson did not stop at the stop sign at Talbot even though another vehicle was waiting to pull onto Talbot. Instead, Jackson went around the vehicle at the stop sign. Officer Lausen testified that he slowed down, but did not stop, at the stop sign, and also went around the vehicle waiting to pull onto Talbot. Jackson turned right on Talbot, and headed towards 3185 and began to pick up speed. Officer Lausen continued to follow Jackson and believed that Detective Cooks was behind him although he did not look to verify this fact. While proceeding on Talbot, Officer Lausen observed that he was traveling a little over 100 miles per hour and started to slow down because he felt it was unsafe and wanted to better control his unit. Officer Lausen estimated that he began to slow down as he passed the St. John Volunteer Fire Department. Officer Lausen testified that while travelling on Talbot to the intersection of 3185 and 3107, he did not remember his unit or Jackson's vehicle running any other vehicles off of the road.
When Jackson reached the intersection of 3185 and 3107, he did not stop for the four-way stop sign or the flashing light. Officer Lausen followed the vehicle through the intersection and also did not stop. Officer Lausen could not recall at what speed he was traveling when he went through the intersection, but knew that he was not traveling 80 or 90 miles per hour. Officer Lausen testified that there were vehicles on all four sides of the intersection when he went through it.
Officer Lausen estimated that he was approximately ¼ to ½ mile behind Jackson, and had just gone through the intersection of 3185 and 3107, when the accident occurred. Officer Lausen stated that it took him approximately 30 seconds to arrive at the accident scene after he saw it happened.
At the accident scene, Officer Lausen stated that he got out of his unit and drew his weapon. He then yelled at everyone to get down because "he might have a gun." Officer Lausen remembered informing Trooper Schexnayder of his suspicion. Officer Lausen testified that he received confirmation on the BOLO right after accident occurred.[5]
*964 Officer Lausen stated that he did not believe he would have caught the vehicle without the accident occurring.
Officer Lausen was familiar with the Department's manual which set forth policies and procedures for pursuit driving in an emergency response code. These policies and procedures, which track the language contained in La. R.S. 32:24, provide that emergency vehicles must be using audible and visual signals to warn motorists of their approach. Officer Lausen testified that he had both his lights and siren on and felt that he had looked out for the safety of all persons. Officer Lausen pointed to the fact that he decreased his speed on Talbot when he saw how fast he was going. Officer Lausen stated that at that point, he was not comfortable driving at that rate of speed and felt that Jackson's behavior and erratic driving posed more of a threat. Officer Lausen further stated that the use of his lights and siren would at least warn people that he was coming. According to Officer Lausen, the pursuit was terminated when he decreased the speed of his vehicle on Talbot. Officer Lausen testified that as he slowed down, Jackson started pulling away. Officer Lausen stated that he kept a visual watch on Jackson so that he could radio his headquarters.
Detective Cooks testified that he was called at home by Officer Lausen about the incoming call informing them that Jackson was in the Midland Drive area in a stolen white car with tinted windows. According to Detective Cooks, he had known Jackson all of his life. When Detective Cooks was informed that the caller was an unidentified female who asked for him, Detective Cooks thought it was Rosalind Moore because he had dealt with her while looking for Jackson.[6] Terrebonne Parish officials had called Detective Cooks for assistance in looking for Jackson, who was wanted on charges of burglary, simple battery, and contempt for aggravated assault. Detective Cooks had taken the officials to Ms. Moore's home to look for Jackson. Detective Cooks stated that Ms. Moore told him that she would call when she saw Jackson because she was afraid of him.
After the call from Officer Lausen, Detective Cooks left his house and went to the Midland Drive area to look for Jackson. As Detective Cooks proceeded southbound on Midland Drive to Ms. Moore's house, he saw a white vehicle with tinted windows backing out of Ms. Moore's driveway. Because the windows were tinted, Detective Cooks stated that he could not see if it was Jackson in the vehicle or how many people were in the vehicle. Detective Cooks testified that he tried to stop the vehicle by putting on his blue lights. Detective Cooks was in an unmarked unit at the time. Detective Cooks then radioed Officer Lausen and asked for his "20", which meant his location, and advised Officer Lausen that he was attempting to shut the vehicle down. Detective Cooks stated that he had enough reasonable suspicion to stop the vehicle.
As the vehicle started speeding away towards the intersection of Bobby Street and Midland Drive, Detective Cooks saw Officer Lausen coming and told him not to totally block the road because he thought Jackson would hit the unit and possibly hurt Officer Lausen. Detective Cooks stated that Ms. Moore told him that Jackson informed her that he was not going to get caught by anybody. Detective Cooks then told Officer Lausen to follow Jackson.
Detective Cooks saw both Jackson and Officer Lausen go through the stop sign and turn onto St. Bernard. Detective Cooks noted that, unlike Jackson, both he and Officer Lausen slowed down before proceeding through the stop sign. Detective Cooks stated that he lost sight of both vehicles after they turned right onto Talbot. Detective Cooks testified that he lost them because he was driving an '87 Chevy Celebrity. Detective Cooks stated that once he got on Talbot, *965 Jackson and Officer Lausen were considerably ahead of him.
Detective Cooks testified that he did not see either Jackson or Officer Lausen run any vehicles off the road. Detective Cooks acknowledged that he noted in his police report that Jackson ran vehicles off the road, however, he testified that he had not personally observed this but rather, witnesses told him this after the accident had occurred.
According to Detective Cooks, either he or Officer Lausen could have terminated the pursuit. Detective Cooks testified that whether a pursuit is terminated would depend upon the officer in the pursuit. Detective Cooks did not believe that termination of a pursuit necessarily meant turning off the lights and sirens, which could also serve to warn the public, or slowing down to a safe speed to watch a vehicle. Detective Cooks stated that neither he nor Officer Lausen had time to decide to terminate the pursuit. He further stated they did not have the time to notify other officers or agencies to pick up surveillance because the pursuit did not last that long. Detective Cooks testified that he was unaware of how fast Officer Lausen was driving.
Although Detective Cooks never radioed Sergeant Long, he heard Officer Lausen in constant contact with the radio room.
Wilbur Cloutier, a deputy with the Lafourche Parish Sheriff's Office, testified that at approximately 5:30 p.m., he heard a radio transmission by Thibodaux Police units regarding a vehicle pursuit. Deputy Cloutier testified that he heard a unit called in to its dispatch center to check out a license plate in reference to a possible stolen vehicle. Deputy Cloutier then heard the dispatch center reply that it was a positive license number for a possible stolen vehicle. At that time, the unit started to follow the vehicle and then a short time later, came over the radio indicating that it was in pursuit of the vehicle. Deputy Cloutier testified that the last transmission he heard was that they were on Talbot, headed towards the Waverly Trailer Park area. Deputy Cloutier stated that he then started heading towards Talbot on 3185. As Deputy Cloutier approached the intersection of 3185 and 3107, he observed a white vehicle traveling down Talbot towards 3185 at a high rate of speed. Deputy Cloutier testified that the white vehicle "flew through the intersection" of 3185 and 3107. Deputy Cloutier estimated that this vehicle was traveling approximately 70 miles per hour. He also noticed that the vehicle "was bouncing" when it went through the intersection. As Deputy Cloutier reached the intersection, he saw Thibodaux police units approaching, braking before going through the stop sign. Deputy Cloutier stated that the first unit, which was marked, traveled through the intersection at a different speed than the white vehicle. He further stated that he could visibly see the reaction of the unit as it braked coming up to the stop sign. Deputy Cloutier observed the second unit do the same thing as it came through the intersection. He remembered that the blue lights on top of the marked unit and the dash light on the second unit were activated but did not recall hearing any sirens. Deputy Cloutier could not definitively state how far the first unit was from the vehicle being pursued. He could only state that he had not yet reached the intersection when the white vehicle traversed it, and was braking to stop at the intersection when the police units went through it. Deputy Cloutier estimated that the marked unit was traveling approximately 55-60 miles per hours. He observed that the speed of the unit was considerably less than the speed of the white vehicle. The second police unit was approximately 75-100 feet behind the first unit, traveling at the same speed. Deputy Cloutier testified that neither unit bounced when they went through the intersection.
Deputy Cloutier stated that he called his dispatch center and advised them that Thibodaux police were in pursuit of a white vehicle on Talbot, heading towards Waverly Trailer Park. He then engaged his overhead lights and proceeded down Talbot at a considerably slower speed because their policy is not to get involved in somebody else's pursuit. Deputy Cloutier noted that he had just turned at the intersection when he saw a big white puff of smoke down the road. He then radioed his dispatch center to send fire and rescue personnel, and an ambulance. At the *966 accident, Deputy Cloutier aided Detective Cooks in getting Jackson out of the vehicle. He noted that Jackson did not resist their efforts. Deputy Cloutier testified that he never drew his revolver and did not remember if any of the other officers drew their revolvers.
Reverend Ronald Melancon testified that he was traveling on the Brule Guillot Road, heading towards 3185 when he saw a white vehicle crossing back and forth between the lanes of traffic, passing other vehicles and jumping into his lane of travel. He did not hear a siren but saw blue lights at a distance behind the white vehicle. Reverend Melancon stated that the white vehicle stayed in his lane of travel until immediately prior to hitting the Reverend's vehicle, when it cut back into its proper lane. Reverend Melancon stated that he veered to the right at that point. He then looked into his rear view mirror after he stopped his vehicle and saw that an accident had occurred. Reverend Melancon testified that he was out of his vehicle and running towards the truck involved in the accident when the first police unit arrived. The second unit arrived shortly thereafter. Reverend Melancon also testified that he did not realize that this incident was a police pursuit until the officer approached the accident scene, with his gun drawn, hollering at the individual to get out of the white vehicle. The officer also told everyone to back up because this individual had a gun. Reverend Melancon stated that the roadway was dry at the time this accident occurred.
Yourick Lavine, Jr. and Harry Bonvillain, Jr. remembered little about the accident other than it was raining at the time. Both witnesses stated that they did not recall seeing any flashing lights; nor did they hear a siren.
Trooper Duane Schexnayder was called to the accident scene and upon arrival, all drivers had been transported from the scene by ambulance. Trooper Schexnayder spoke with Officer Lausen and Deputy Cloutier, but did not speak to Detective Cooks. He also spoke with Michael Adams and Reverend Melancon, two witnesses to the accident who gave handwritten statements. Trooper Schexnayder determined that Jackson's vehicle was northbound on 3107 when it crossed the centerline and struck Lavine's vehicle which was southbound. He subsequently charged Jackson with a traffic violation and negligent injuring. He also learned through a radio transmission from Troop C that Jackson's vehicle was taken in an October 6, 1993, armed robbery in Morgan City. In his report, Trooper Schexnayder noted that the weather was cloudy and the road surface was wet. According to Trooper Schexnayder, it was his understanding that at time of impact, Officer Lausen's unit had its blue lights and sirens activated. He estimated the speed of Jackson's vehicle to be 100 miles per hour and the speed of Lavine's vehicle at 35 miles per hour.
Gary Kessel, a lieutenant with the New Orleans Police Department, testified as an expert in law enforcement, procedure, policy and training. Kessel testified that the International Association of Chiefs of Police (IACP) National Law Enforcement Policy Center promulgated policies which he considered to be the industry standard and he relied on its statements in his field of expertise.
According to Kessel, Officer Lausen and Detective Cooks engaged in a pursuit which was unnecessary. Kessel explained that most perpetrators will use a stolen vehicle to escape so provisions must be made to prevent this from happening. According to Kessel, Officer Lausen and Detective Cooks had an opportunity to make such provisions in this case. Kessel acknowledged that he had suggested in previous testimony that the area should have been cordoned off before officers attempted to apprehend Jackson.
Kessel was also of the opinion that Officer Lausen should have blocked the intersection, suggesting that it would have been better for Jackson to hit one car than to put the public in danger. Kessel thought this was especially true in light of Ms. Moore's testimony that Jackson said he was going to hurt somebody. Kessel thought it highly unlikely that Officer Lausen would have been injured if he had blocked Jackson. Kessel did not agree with Officer Lausen's determination that Jackson *967 could have gone around his unit if he had blocked the intersection.
Kessel further stated that Officer Lausen and Detective Cooks unnecessarily exposed the public to the dangers of pursuit. Kessel stated that the pursuit reached a point where the dangers to the officer, the pursued party and the public far outweighed any possible benefits of apprehension. Kessel also stated that the pursuit reached a point where it was futile.
Kessel was also of the opinion that the pursuit should have been terminated. In making this determination, Kessel stated that there are three factors to consider: (1) the roadway conditions; (2) the chase becomes futile; and (3) the danger outweighs the possible benefits of apprehension. Kessel noted that in this situation, the roadways were small, relatively unimproved streets. Kessel also pointed to the accident report which indicated that the road was wet. Kessel noted that the speed traveled here was too much for these roadway conditions. The density of traffic is also a consideration but Kessel acknowledged that there was little information in the record addressing this factor. Kessel further acknowledged that Officer Lausen's testimony indicated that all three of these conditions for mandatory termination were met right after he made his turn onto Talbot. However, Kessel stated that Officer Lausen did not procedurally terminate the pursuit. Kessel testified that, according to the IACP Model Policy on Vehicular Pursuit, there are two alternatives to pursuit: (1) no pursuit or (2) following at a safe speed. According to Kessel, following at a safe speed meant going the speed limit and turning off the lights and sirens. Kessel pointed out that after Officer Lausen determined that he could not catch up to Jackson, he slowed down but continued to travel above the speed limit and kept his lights and sirens on. Kessel disputed Officer Lausen's assertion that he kept his lights and sirens on as he traveled down Talbot towards the 3185 intersection to warn motorists of Jackson's approach. Kessel was of the opinion that the lights and sirens had no bearing on protecting oncoming motorists and pointed out that Jackson might still have believed he was being pursued. Kessel noted that the IACP model policy stated that when a violator's identity is known and his behavior is not endangering others, high-speed pursuit is unnecessary because he can be apprehended at some other time. Kessel pointed out that Officer Lausen and Detective Cooks knew Jackson.
Kessel noted that Officer Lausen's testimony, that he reduced his speed when he reached the intersection of 3185 and 3107, indicated that Officer Lausen was still going over the speed limit when he went through the intersection. Kessel referred to the Thibodaux Police Department Policy and Procedure Manual, which established the procedures to be followed for pursuit driving in an emergency response code. The Manual provides that a driver of an authorized emergency vehicle may exceed the maximum speed limits as long as he does not endanger life or property. This exception, and others like it, "[a]pply only when the vehicles are making use of audible or visual signals sufficient to warn the motorist of their approach." The Manual further added that these procedures do not relieve the driver from the duty to drive with due regard for the safety of all persons. According to Kessel, Officer Lausen and Detective Cooks were under a duty to comply with these policies. Kessel stated that, in his opinion, life or property were endangered in this pursuit.
Kessel also examined the Department's radio log for October 13, 1993, and noted that it made no mention of anything other than a vehicular stop during pursuit. The radio log did reflect that a license plate number was called in but Kessel stated that Officer Lausen should have communicated his suspicions about the BOLO so that additional resources might have been placed at his disposal.
Kessel further testified that the correct procedure in a pursuit is for the pursuing officer to notify someone that a pursuit has been initiated, and communicate details, such as reasons for the pursuit, description of the violator and vehicle, the direction and speed of travel, to the supervisor.
George Armbruster, Chief of Staff and Warden with the Lafayette Parish Sheriffs Office, was qualified as an expert in police *968 policy and procedures. Armbruster estimated the distances of the pursuit route as follows:

St. Bernard/Bobby to Talbot 2/10ths of a mile
Intersection of Talbot to fire
 station 3/10ths of a mile
Fire station to 3185 intersection 6/10ths of a mile
3185 intersection to accident
 location 8/10ths of a mile

Armbruster traveled the pursuit route, beginning from Ms. Moore's driveway and ending at the accident scene, at approximately 30-35 miles per hour, stopping at four stop signs. Armbruster estimated that this route took him three minutes and ten seconds to travel. Armbruster estimated that the entire pursuit (until Officer Lausen slowed down at the fire station) lasted less than one minute.
Armbruster first disagreed with Kessel's opinion that the area where Jackson was allegedly located should have cordoned off before attempting to apprehend him. Armbruster noted that the officers did not yet have enough information and Detective Cooks was correct in verifying the "tip" he had received. Additionally, Armbruster noted that the area to be cordoned off was too large.
Armbruster did not believe that Officer Lausen should have blocked off the intersection Armbruster stated that the IACP model policy provides that a roadblock should be used as a last resort. Armbruster testified that at the point when Officer Lausen was at the intersection in question, the situation was not at the "last resort" stage. Armbruster also affirmed Officer Lausen's assertion that the intersection could not have been blocked off by one vehicle.
Armbruster stated that the IACP model policy provides that the officer who actually wants to stop the vehicle in question makes the decision whether to initiate a pursuit and this determination is based upon the actions of the violator. In light of Officer Lausen's information from Detective Cooks that there were warrants out for Jackson, and the fact that the vehicle was possibly stolen, Armbruster opined that the situation was serious enough for an officer to at least attempt to apprehend or stop the vehicle. Armbruster pointed out that an officer does not have to know that a person has committed a crime; he need only operate under a reasonable suspicion.
Armbruster disagreed with Kessel's opinion that because Detective Cooks knew who the violator was, they should have just let him go. Armbruster acknowledged that the IACP model policy provides that when a suspect's identity has been established, a pursuit should be terminated. However, Armbruster pointed out that Detective Cooks had been looking for Jackson for several weeks and had been unable to locate him. Armbruster observed that there was no way of knowing if later apprehension would be accomplished. Additionally, Armbruster noted that part of an officer's duty is to apprehend criminals. Armbruster was of the opinion that this short-term pursuit was justified in this instance.
Armbruster testified there were several factors to consider in determining whether a pursuit should be continued. Armbruster stated that nothing he heard or read about traffic density affected this pursuit. Armbruster noted that the IACP model policy considers traffic density just one factor to take into consideration, the denser the traffic, the more difficult it will be to continue a high-speed chase.
Armbruster also testified that nothing about the weather played any part in this pursuit. Although some witnesses testified that it was dry and some testified that it was wet, Armbruster stated that weather conditions such as a bad storm or heavy fog are more important considerations because they may affect the safety of the driving.
Armbruster agreed with Kessel's opinion that Officer Lausen followed police procedure in his pursuit. Armbruster stated that the pursuit became futile when Officer Lausen was traveling at a high rate of speed and Jackson was still pulling away. However, Armbruster did not agree with Kessel's opinion that Officer Lausen erred by leaving his lights and sirens on at this point. As Officer Lausen explained, it was the only way he could warn traffic at the upcoming intersection. Armbruster stated that Officer Lausen's actions were supported by the IACP model policy, which provides that you *969 can follow at a safe distance and a safe speed. Armbruster stated that the IACP model policy provides that a safe speed is whatever the speed is for that particular location; however, it does not state that you have to drop down to the speed limit.
Armbruster reviewed the Department's policy for this situation and noted that there are four things that should be communicated by an officer: 1) his location; 2) the vehicle description; 3) the direction of travel; and 4) the speed at which he is traveling. Armbruster acknowledged that Officer Lausen did not report his traveling speed. However, Armbruster stated that speed is a factor only when it is unsafe to the public and Officer Lausen was only at a high speed for a short time. Armbruster observed that Officer Lausen's failure to tell his supervisor the speed he was traveling was not a material omission because Officer Lausen did what the supervisor would have probably told him to doslow down.
Armbruster defined a pursuit as trying to actively overtake the suspect. Because Officer Lausen testified that, in his mind, that he ceased the pursuit when he decreased his speed, the pursuit was terminated at that point. Armbruster reiterated that a "safe speed" was where the officer is not endangering anybody. Armbruster did not think that the fact that Officer Lausen was still following Jackson would cause Jackson to have kept going faster. Armbruster stated that the officer has no control over the other driver.
Armbruster also noted that the decision to overtake a vehicle being pursued as quickly as possible is a discretionary call on the part of the officer and depends upon such factors as the weather, road conditions, etc.
Armbruster also testified that the fact that Officer Lausen exceeded the speed limit when he went through the 3185 intersection without stopping was not a violation of 32:24 because, although he was no longer actively involved in a pursuit, he was still in an emergency response code and trying to follow Jackson.
In its reasons for judgment, the trial court found that plaintiffs failed to prove by a preponderance of the evidence that these two officers breached the duty owed in this case. A thorough review of the record indicates that the trial court's finding is not manifestly erroneous or clearly wrong; therefore, this argument is without merit.

NEGLIGENCE OF SERGEANT LONG
Plaintiffs first contend that Sergeant Long was negligent in his supervision of Officer Lausen and Detective Cooks during the pursuit. Specifically, plaintiffs argue that Sergeant Long failed to obtain information from these officers during the pursuit and failed to order the pursuit be terminated and abandoned. Plaintiffs allege that Sergeant Long's negligence is imputed to the City of Thibodaux. Plaintiffs' argument is based solely on the testimony of Kessel.
Sergeant Long was not named as a defendant in this case; nor was he called to testify at trial. According to Officer Lausen, Sergeant Roddy Long was his supervisor at the time of this incident.
Kessel testified that during this pursuit, there was a complete absence of supervisor intervention or supervisory control. Kessel stated that the IACP model policy provides that a supervisor's responsibility is to receive information from the pursuing officer, such as the reasons for the pursuit, description of the violator and vehicle, and the direction and speed of travel. Kessel stated that the supervisor is to act as an objective controller of the situation. According to Kessel, neither Officer Lausen nor Sergeant Long followed this procedure.
Kessel acknowledged that he never spoke to Sergeant Long and formulated his opinion after reviewing the statements of others. Kessel stated that Sergeant Long should have been made aware that a detective in the field was going to a location to look for a wanted suspect. Kessel further stated that Sergeant Long should have known that another officer was going to the location to assist him and should have known that the suspect was trying to effect an escape from 1725 Midland. Kessel testified that, by definition, pursuit begins when a signal to stop is given and the person refuses to comply and *970 starts to run away. According to Kessel, this occurred at 1725 Midland.
Armbruster testified that a supervisor's role is to monitor the pursuit and, if in the supervisor's opinion the factors that are relayed to him indicate that the pursuit should be terminated, then he should do that. Armbruster believed that Sergeant Long had sufficient information to know that the pursuit was taking place. According to Armbruster, Officer Lausen relayed all of the required information except his speed which he did not deem to be a material omission under the circumstances.
Plaintiffs also contend that Sergeant Long was negligent because he allowed Officer Lausen and Detective Cooks to pursue Jackson, outside of Thibodaux's city limits, in violation of the police chiefs order. Plaintiffs argue that Sergeant Long should have ordered the pursuit to stop as soon as it proceeded past the city limits. Plaintiffs argue that but for the violation of the order, this accident would not have occurred.
The directive issued by Chief Donald Bonvillain on October 5, 1993, stated as follows:
There will be no out-of-town pursuit on traffic violations or misdemeanor offenses. You shall discontinue pursuit at the city limits. Appropriate action will be taken against anyone violating this directive. Only pursuit allowed will be for murderers, armed robberies of banks, or convenient-department stores. In these instances, shift commander will be notified with no exception to the rule
The directive issued by Chief Donald Bonvillain provided that there would be no out-of-town pursuit on traffic violations or misdemeanor offenses. The record clearly indicates that Jackson was being pursued for more serious offenses. Additionally, Officer Lausen admitted that he did not discontinue his pursuit of Jackson at the city limits but noted that this requirement applied to misdemeanors; Officer Lausen believed the pursued vehicle was stolen. Officer Lausen also stated that they were told by shift commanders that this directive was merely a guideline. Particularly, we note that Chief Donald Bonvillain did not testify at the trial of this matter. For these reasons, this argument is without merit.[7]

NEGLIGENCE OF CITY OF THIBODAUX
Plaintiffs next contend that the City of Thibodaux was negligent in failing to provide its officers with adequate training in the area of pursuit and pursuit driving. Officer Lausen testified that he received classroom training in pursuit driving at the Academy. At the Academy, they were instructed to follow the dictates of La. R.S. 32:24. Detective Cooks testified that he received no pursuit training.
Again, in support of their claim, plaintiffs rely solely on the testimony of Kessel who testified that Officer Lausen and Detective Cooks' lack of training in the area of pursuits constituted a deficiency in their training. Kessel acknowledged these officers had the basic training but stated that they should have had more recurrent training on policies, IACP standards, recent policies, and the like. Kessel did acknowledge that Officer Lausen had only been out of the Academy for a short period of time so the City would have had no opportunity to provide him additional training. However, Kessel pointed out that the Department does not make this training available to veteran officers. Kessel admitted that he has never taught pursuit training and is not certified to teach it.
Armbruster did not see any deficiencies in the training of these police officers. Armbruster pointed out that there are only a few pursuit driving courses in Louisiana. Additionally, Armbruster has been an instructor in police pursuit and found no violations in Officer Lausen's actions.
Plaintiffs offered no evidence to establish what would be adequate training for officers in this instance. Kessel's testimony on this *971 issue did not establish that the City was negligent in this instance. This argument is without merit.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to plaintiffs.
AFFIRMED.
GUIDRY, J., concurs.
NOTES
[1] Judge Remy Chiasson, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] Although this opinion does not address each assignment of error individually, it disposes of all issues.
[3] La. R.S. 32:24 provides as follows:

A. The driver of an authorized emergency vehicle, when responding to an emergency call, or when in the pursuit of an actual or suspected violator of the law, or when responding to, but not upon returning from, a fire alarm, may exercise the privileges set forth in this Section, but subject to the conditions herein stated.
B. The driver of an authorized emergency vehicle may:
(1) Park or stand, irrespective of the provisions of this Chapter [Traffic Regulations];
(2) Proceed past a red or stop signal or stop sign, but only after slowing down or stopping as may be necessary for safe operation;
(3) Exceed the maximum speed limits so long as he does not endanger life or property;
(4) Disregard regulations governing the direction of movement or turning in specified directions.
C. The exceptions herein granted to an authorized emergency vehicle shall apply only when such vehicle is making use of audible or visual signals sufficient to warn motorists of their approach, except that a police vehicle need not be equipped with or display a red light visible from in front of the vehicle.
D. The foregoing provisions shall not relieve the driver of an authorized vehicle from the duty to drive with due regard for the safety of all persons, nor shall such provisions protect the driver from the consequences of his reckless disregard for the safety of others.
[4] According to Officer Lausen, a BOLO is a computer transmission that comes across from other state agencies on the State Police computer. Any agency that has a computer terminal can put in the required information to send out to other agencies to alert them to situations such as like weather, upcoming events, classroom training, etc.
[5] A copy of the BOLO, dated October 6, 1993, was introduced into evidence and provides, in pertinent part:

BOLO for white 1987 Olds 98, 4 door, bearing La. Lic. No. 4121370, occupied by at least one black male suspect armed with a [.44] mag handgun. Vehicle was stolen from its registered owner at gunpoint in Morgan City approx[.] 15:09 hrs. Stolen car traveling at high speeds eluded pursuing police units and was last seen on U.S. Hwy. 90 in Gibson.
[6] Rosalind Moore testified at trial that she was not the unidentified female who called the Department that day.
[7] In a related issue, plaintiffs argue that Officer Lausen and Detective Cooks cannot invoke the provisions of La. R.S. 32.24 because (1) they were not authorized officials of Thibodaux because they traveled outside of the city limits, and (2) they were not on an official emergency, as defined by the directive, so they were acting as private citizens. A police vehicle is an authorized emergency vehicle as defined in La. R.S. 32:1(1).