760 So.2d 355 (1999)
Paula RICHARD, Individually and as Natural Tutrix of Her Minor Child, Ashley Richard
v.
Michael M. SWIBER, State Farm Mutual Automobile Insurance Company, et al.
No. 98 CW 1515.
Court of Appeal of Louisiana, First Circuit.
September 24, 1999.
*356 Pascal M. Howard, Morgan City, for Plaintiff-Respondent Paula Richard, Individually, and on behalf of her minor child, Ashley Richard.
Michael R. Zsembik, Waller & Associates, Metairie, for Defendant-Relator Ourso Funeral Home, Airline Gonzales, Inc., d/b/a Hargrave Funeral Home.
Before: LeBLANC, FOGG, and PARRO, JJ.
PARRO, J.
Ourso Funeral Home, Airline Gonzales, Inc., d/b/a Hargrave Funeral Home, brings *357 this application for supervisory review of the trial court's denial of its motion for summary judgment. Finding merit in its argument, we grant the writ application, reverse the trial court, and grant the motion for summary judgment.

FACTUAL AND PROCEDURAL HISTORY
This case arises out of a collision that occurred in a residential neighborhood in Morgan City, Louisiana, when a participant in a funeral procession proceeded through an intersection without stopping at a stop sign. Paula Richard was driving her car along Elm Street, following the other vehicles in the procession; her daughter, Ashley Richard, was a passenger in the front seat of the car. The funeral procession was led by a police escort; there were four or five vehicles, including the hearse, between Ms. Richard and the police escort. Ms. Richard testified in her deposition that, although the vehicle ahead of her did not stop at the intersection with Onstead Street, she looked both ways as she approached the stop sign and did not see any oncoming vehicles. However, Michael Swiber was driving his pickup truck on Onstead and was approaching the intersection with Elm. Onstead was the favored street; it had no stop sign at the intersection. Mr. Swiber stated in his deposition that he was not aware there was a funeral procession, but he saw the Richard vehicle slow down and thought Ms. Richard was going to stop for the sign. When Mr. Swiber realized the Richard vehicle was proceeding, he swerved in an attempt to avoid the collision, but hit the front driver's side of her car. Ms. Richard and Ashley were injured.
The Richards sued Mr. Swiber and his liability insurer, State Farm Mutual Automobile Insurance Company (State Farm); State Farm as Ms. Richard's underinsured motorist carrier; the Morgan City Police Department and the City of Morgan City, which provided the police escort; the city's insurer, St. Paul Fire & Marine Insurance Company (St.Paul); and Ourso Funeral Home, Airline Gonzales, Inc., d/b/a Hargrave Funeral Home (Ourso), the funeral home in charge of the funeral arrangements. All of the defendants filed motions for summary judgment, supported by numerous depositions of the parties and other witnesses to the accident. The trial court found there were factual matters in dispute relative to the negligence of the police officer, the city, Mr. Swiber, and Ourso. The court also found that a policy exclusion relied on by St. Paul was inapplicable. Therefore, the trial court denied all motions for summary judgment. Concerning Ourso's liability, the court stated:
Next, I consider the Motion for Summary Judgment by Ourso Funeral Home, Airline Gonzales, Inc. Since the funeral home made arrangements for the police escort, and since the funeral home is aware and knows and understands that people in a funeral procession follow close behind one another with a police escort and that these persons regularly proceed through stop signs, yield signs, and red lights, Ourso Funeral Home had a duty to see that the arrangements with the police officers were adequate for the intersections to be traversed by the funeral procession, or a duty to warn persons in the funeral procession that they should not disregard any traffic signals. Since Ourso is the organizer of this funeral procession and the person employed by the family to handle the funeral arrangements, procession, and burial, [it has] a duty to see that the funeral procession is carried out in a safe manner or to warn participants of the known dangers.
Ourso applied to this court for supervisory relief, which was denied. Richard v. Swiber, 98-1515 (La.App. 1st Cir.11/20/98)(unpublished writ action). Ourso applied for supervisory and/or remedial writs to the Louisiana Supreme Court, which granted the writ and remanded the case to this court for briefing, *358 argument, and opinion. Richard v. Swiber, 98-3129 (La.2/5/99), 737 So.2d 734.

APPLICABLE LAW

Supervisory Jurisdiction and Summary Judgment
A court of appeal has plenary power to exercise supervisory jurisdiction over trial courts and may do so at any time, according to the discretion of the court. In cases in which a peremptory exception has been overruled by the trial court, the appellate court appropriately exercises its supervisory jurisdiction when the trial court's ruling is arguably incorrect, a reversal will terminate the litigation, and there is no dispute of fact to be resolved. Charlet v. Legislature of State of Louisiana, 97-0212 (La.App. 1st Cir.6/29/98), 713 So.2d 1199, 1202, writs denied, 98-2023, 98-2026 (La.11/13/98), 730 So.2d 934. In such instances, judicial efficiency and fundamental fairness to the litigants dictate that the merits of the application for supervisory writs should be decided in an attempt to avoid the waste of time and expense of a possibly useless future trial on the merits. Herlitz Const. Co., Inc. v. Hotel Investors of New Iberia, Inc., 396 So.2d 878 (La.1981) (per curiam). This supervisory jurisdiction may also be exercised to reverse a trial court's denial of a motion for summary judgment and to enter summary judgment in favor of the mover. See Hoover v. Livingston Bank, 451 So.2d 3 (La.App. 1st Cir.1984); Bonfiglio v. Bellsouth Advertising and Pub. Corp., 619 So.2d 135 (La.App. 1st Cir.), writ denied, 620 So.2d 864 (La.1993).
Appellate courts review summary judgments de novo under the same criteria that govern the trial court's consideration of whether a summary judgment is appropriate. Guillory v. Interstate Gas Station, 94-1767 (La.3/30/95), 653 So.2d 1152, 1155. The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of actions. The procedure is favored and shall be construed to accomplish these ends. LSA-C.C.P. art. 966(A)(2). The initial burden of proof is on the mover to show that no genuine issue of material fact exists. LSA-C.C.P. art. 966(C)(2). However, once the mover has made a prima facie showing that the motion should be granted, if the non-movant bears the burden of proof at trial on the issue before the court, the burden shifts to him to present evidence demonstrating that material factual issues remain. See LSA-C.C.P. art. 966(C)(2); Hayes v. Autin, 96-287 (La. App. 3rd Cir.12/26/96), 685 So.2d 691, 694, writ denied, 97-0281 (La.3/14/97), 690 So.2d 41. A motion for summary judgment is properly granted only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to material fact, and that the mover is entitled to judgment as a matter of law. LSA-C.C.P. art. 966(B).

Negligence
Louisiana Civil Code articles 2315 and 2316 are the codal bases for a claim in tort. Article 2315 states that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." Article 2316 provides that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." Porteous v. St. Ann's Cafe & Deli, 97-0837 (La.5/29/98), 713 So.2d 454, 456-67. To determine whether liability exists under the facts of a particular case, the supreme court has adopted a duty-risk analysis. Under this analysis, the plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to the plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Berry v. State, Through Dep't of Health and Human Resources, 93-2748 (La.5/23/94), 637 So.2d 412, 414; Lavine v. Jackson, 97-2804 (La.App. 1st Cir.12/28/98), 730 So.2d 958, 961, writ denied *359 99-0898 (La.5/28/99), 743 So.2d 677. A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability. Mathieu v. Imperial Toy Corp., 94-0952 (La.11/30/94), 646 So.2d 318, 326.
The first determination in the dutyrisk analysis is cause-in fact. Boykin v. Louisiana Transit Co., Inc., 96-1932 (La.3/4/98), 707 So.2d 1225, 1230. The inquiry to be made is whether the accident would have occurred, but for the defendant's alleged substandard conduct or, when concurrent causes are involved, whether the defendant's conduct was a substantial factor in bringing about the accident. Daye v. General Motors Corp., 97-1653 (La.9/9/98), 720 So.2d 654, 659.
Duty is a question of law. Simply put, the inquiry is whether the plaintiff has any lawstatutory, jurisprudential, or arising from general principles of faultto support his claim. Faucheaux v. Terrebonne Consol. Gov't, 615 So.2d 289, 292 (La.1993); Clark v. Dep't of Pub. Safety and Corrections, 96-2737 (La.App. 1st Cir.2/20/98), 716 So.2d 1, 3, writ denied, 98-1201 (La.6/19/98), 720 So.2d 1216.

ANALYSIS
The facts pertaining to the potential liability of Ourso are not in dispute. Ourso was in charge of the funeral, including making arrangements for the funeral procession from the church to the grave site. The funeral director, James Hargrave, stated that as part of Ourso's standard procedure, his wife, an Ourso employee, telephoned the Morgan City Police Department to request a police escort from Holy Cross Church to the Morgan City Graveyard. The department traditionally provided such escorts without charge as a public service. The police officer to whom this duty was assigned, James Wallace Bennett, testified in his deposition that he had sole responsibility for choosing the route and deciding how many officers were necessary to accompany the procession, a decision which depended largely on the nature of the route. The chosen route was through a residential area and was the same one taken every time a procession traveled between these two locations.
There were no instructions given by the police escort or the funeral director to persons who were traveling with the procession. The procedures followed by the drivers in the procession were established by custom and tradition, and included falling in line behind the hearse, driving slowly with lights on, following closely behind the preceding vehicle, and proceeding slowly through intersections along the route. Officer Bennett stated in his deposition that he kept the police unit's blue lights throughout the procession, stopped and checked each intersection as he entered, and sounded the siren as he proceeded very slowly through each intersection. Officer Bennett also said his speed as he went through each intersection was not more than two to three miles per hour, the speed at which the car would travel just after he released the brakes.
Mr. Hargrave drove the family car directly behind the hearse; the police escort was one or two cars ahead of the hearse. Mr. Hargrave stated in his deposition that his normal procedure was to keep up with the procession and not stop at any intersection unless the hearse ahead of him stopped. He recalled that neither he nor the hearse stopped at the stop sign at the intersection of Elm and Onstead.
Ms. Richard's sister, Elizabeth Falgout, was driving the car directly in front of Ms. Richard. She testified in her deposition that as she approached the stop sign at the intersection of Elm and Onstead, she checked to see whether any traffic was approaching from the right or left, slowed her vehicle, and proceeded through the intersection without stopping. Ms. Falgout did not recall seeing the pickup truck that struck her sister's car. Her husband, Phillip, was riding with her and stated they were travelling at a speed of 10 to 15 miles per hour down Elm. He also looked *360 right and left as his wife slowed before entering the intersection, and he saw a white vehicle approaching from the left about a block and a half away on Onstead. Just after they cleared the intersection, he heard the noise as the pickup truck hit Ms. Richard's car.
Ms. Richard stated in her deposition that neither the police escort nor anyone from the funeral home gave her any instructions about what to do in the procession. Her brother simply told her to put her car in line with the rest of the procession. She turned on her car's headlights in the church parking lot. After leaving the church, the procession made two right turns and proceeded on Elm toward Onstead. Ms. Richard estimated her rate of speed as 15 miles per hour; she was about half a car length behind the preceding car, which was about half a car length behind the car in front of it. The stop sign on Elm at Onstead was the first traffic sign along the route. The vehicles ahead of her did not stop at the stop sign; Ms. Richard also did not stop. She stated, "I looked to my right and looked to my left and didn't see anything as I was entering the intersection." She further explained:
Just as the front end of my car entered the intersection is when I saw it, but when I entered the intersection I looked to the left and I looked to the right as I was entering it and I didn't see anything, but once my car got in the middle of the intersection is when I saw, when I looked again and I could see this thing coming and I looked to my left and saw.
She also said that if she had seen an approaching vehicle, she would have stopped. Her car was struck on the driver's side by the front of the oncoming pickup truck.
Ourso contends the undisputed material facts demonstrate its action or inaction was not a cause-in-fact of the accident, and it did not breach whatever duty it may have owed to drivers in the funeral procession. Ourso argues it had no authority over the police escort and could not have instructed the police escort to use additional personnel to secure each intersection along the route. Therefore, it fulfilled its duty to provide a safe funeral procession by arranging for it to be accompanied and led by a trained professional, the police escort. Additionally, Ourso contends the trial court erred in concluding it had a duty to warn participants in the funeral procession about "known dangers."
The only Louisiana case involving the liability of the funeral home when an accident occurs during a funeral procession is Pickett v. Jacob Schoen & Son, Inc., 488 So.2d 1257 (La.App. 4th Cir.1986). Ms. Richard contends this court should rely on the Pickett case and determine that the trial court was correct in denying Ourso's motion. In Pickett, the funeral director did not arrange for a police escort for a funeral procession down Airline Highway, a major New Orleans thoroughfare; the accident occurred at an intersection controlled by a traffic light. The plaintiff claimed there was a breach of duty in failing to suggest, offer, or provide an escort for the procession, or in failing to advise the participants of the proper rules of the road for an unescorted procession. The court concluded that:
Based on the record before us, we cannot say as a matter of law that a funeral director has no duty to those who participate in a funeral procession arranged by him to prevent the risks encompassed by the facts of this case. The affidavits ... raise issues of material fact ... as to what risks a "reasonable man" funeral director in the New Orleans area should foresee in conducting a funeral procession, and what measures he may or should take to prevent them. This factual question precludes the use of summary judgment.
Pickett, 488 So.2d at 1259. The court also cited the summary judgment law then in effect, noting that any doubt was to be resolved against the granting of summary judgment.
*361 The Pickett case is not helpful in the case before this court, for two reasons. First, with the revisions to the summary judgment articles in 1996 and 1997, this procedure has undergone significant changes, such that summary judgments are now favored and a more complex set of criteria govern whether or not a summary judgment is appropriate. Second, the Pickett court was evaluating a possible breach of duty when the funeral procession was unescorted and proceeding along a major New Orleans highway. In contrast, Ourso made arrangements for professional assistance from the police to be sure the funeral procession through a residential neighborhood was conducted as safely as possible.
The cases from other jurisdictions cited by Ms. Richard also involve situations in which the duty of the funeral home or funeral director was evaluated in the context of an unescorted funeral procession or one in which the funeral director voluntarily led the procession himself, with no professional assistance. See Union Park Memorial Chapel v. Hutt, 670 So.2d 64 (Fla. 1996); McCorvey v. Smith, 411 So.2d 273 (Fla.Dist.Ct.App.1982); Maida v. Velella, 69 N.Y.2d 1026, 511 N.E.2d 56, 517 N.Y.S.2d 912 (1987). Therefore, while illustrative of the fact that some breach of duty may have occurred in those circumstances, none of those cases involves a factual situation like the case we are evaluating.
Initially, in analyzing this case, we must determine whether the accident would have occurred, but for Ourso's alleged substandard conduct or, when concurrent causes are involved, as alleged in this case, whether Ourso's conduct was a substantial factor in bringing about the accident.
One contention of alleged substandard conduct is Ourso's failure to properly instruct the police escort to ensure the procession could safely travel through intersections controlled by traffic signs and signals along the route. However, the testimony of Officer Bennett clearly establishes that he had the sole authority to decide which route to take, how many police officers to use, and how to conduct the procession. Officer Bennett had received professional instruction in the leading of funeral processions and had been trained by an experienced police officer in the best routes and methods to use in Morgan City. He had taken many funeral processions along this same route without incident. There is no indication that Officer Bennett would have done anything differently, even if Ourso had attempted to provide instructions to him.
Concerning the alleged duty to instruct or warn the funeral participants, it is also clear from this record that the participants knew there was some risk inherent in proceeding through a stop sign, even though they were in a funeral procession led by a police escort. Ms. Richard said herself that she looked to the left and right before entering the intersection, but simply failed to see Mr. Swiber's approaching pickup truck. Had she seen the truck, she would have stopped. Her brother-in-law in the preceding vehicle saw the truck coming, but it was far enough away for the Falgout vehicle to safely navigate the intersection without stopping. Ms. Falgout also testified that she slowed her vehicle and looked both ways before entering the intersection. Ourso's alleged failure to advise the participants to be careful was not a substantial factor in causing this accident. The record shows Ms. Richard was careful, but simply was not careful enough. In light of this evidence, it is obvious that Ms. Richard acted in a manner that would have been consistent with Ourso's performance of its alleged duty to instruct or warn the funeral participants to be careful. But Ms. Richard was negligent in failing to see, after looking, the oncoming truck. It was this negligence, together with any possible negligence by Mr. Swiber or any other defendant, that was the cause in fact of the accident.
Finally, although not alluded to by the trial court, Ms. Richard suggests in briefs *362 that Ourso was liable because Mr. Hargrave, who was driving one of the cars ahead of her, proceeded through the intersection without stopping, thus setting the standard and inducing her to believe it was safe to follow. This suggestion is belied by her own admission that she would have stopped if she had seen the Swiber pickup truck coming toward her. By her own testimony, she would not have followed that driving standard if she had been more observant.
After a thorough review of the record and the jurisprudence from Louisiana and other states concerning the liability of funeral directors or funeral homes, we conclude that Ourso is not liable for the injuries to Ms. Richard, based on the undisputed facts in this case, because Ourso's actions or inactions were not a cause in fact of this accident. Therefore, we conclude the trial court erred in denying Ourso's motion for summary judgment under the particular facts of this case.

CONCLUSION
Accordingly, we exercise our supervisory jurisdiction to reverse the judgment of the trial court. Summary judgment is hereby entered in favor of Ourso, dismissing Ms. Richard's claim against it, with prejudice, and at her costs.
WRIT GRANTED; REVERSED AND RENDERED.