761 So.2d 1 (1999)
Bernie METREJEAN and Bobbie Metrejean, Individually and on Behalf of the Minor Children Bernie Metrejean, Jr. and Misti Metrejean
v.
PRUDENTIAL INSURANCE COMPANY and Dean Pellegrin.
No. 98 CA 2170.
Court of Appeal of Louisiana, First Circuit.
November 5, 1999.
*2 Hugh B. Exnicios, Metairie, Carolyn A. McNabb, Michael X. St. Martin, Houma, for Plaintiffs-Appellants Bernie Metrejean, et al.
William F. Kelly, Metairie, for Defendants-Appellees Prudential Property and Casualty Insurance Co. and Dean Pellegrin.
John D. Schoonenberg, Houma, for Broadmoor Drug Center, Inc. and Dean Pellegrin.
George L. LaMarca, Metairie, for Broadmoor Drug Center, Inc. and Continental Casualty Company.
Before: SHORTESS, PARRO, and KUHN, JJ.
PARRO, J.
This is an appeal from a judgment rendered pursuant to a jury verdict in a personal injury case arising out of an automobile *3 accident. Bernie and Bobbie Metrejean appeal the damages awarded by the jury, contending the amounts are so low that they are an abuse of the jury's discretion. Based on a thorough review of the record, we affirm.

DISCUSSION
On March 18, 1995, Bernie Metrejean was injured in an automobile accident when fifteen-year-old Angle Pellegrin turned left in front of him, causing a head-on collision with his vehicle. Bernie's wife, Bobbie, and their two children, Misti and Bernie, Jr., were riding with him when the accident occurred. Accompanied by her mother, Angie was driving a car owned by her father, Dean Pellegrin, which was insured under an automobile liability insurance policy issued by Prudential Property and Casualty Insurance Company (Prudential). Angie was on an errand for her father, Dean Pellegrin, who owns Broadmoor Drug Center, Inc. (Broadmoor). At his request, she was bringing him a briefcase containing business documents that he needed at work. Broadmoor was insured by Continental Casualty Company (Continental). The lawsuit sought damages for Bernie, his wife, and their two children, and named Dean Pellegrin, Prudential, Broadmoor, and Continental as defendants. The personal injury claims of Bobbie and the two children were settled, and the case proceeded to trial on the issues of Bernie's damages and the loss of consortium claims of his family.

Plaintiffs' Claims
Bernie claimed he hit his head in the accident and suffered chronic debilitating headaches as a result. He also claimed his personality changed after the accident, leaving him anxious, irritable, hostile, withdrawn, paranoid, and depressed. Because of the pain and mental problems, Bernie was unable to return to work and his relationship with his family became severely strained. On at least one occasion, he threatened to commit suicide. Fearing his aggressive outbursts, his wife took the children and left several times, but always returned. Various family members and friends confirmed the change in his attitude, stating he "was not the same person" after the accident. His treating physicians diagnosed his condition as post-trauma headaches and personality change due to head trauma.
Bernie was initially treated in the emergency room of Terrebonne General Medical Center, where the records show he had multiple lacerations on his left hand and forearm, an abrasion on his right knee, and a slightly tender area on his left superior forehead. An x-ray showed no skull fracture, and the hospital records do not show that sutures were needed for his head injury. He was sent home with instructions for closed head injury, along with prescriptions for pain medication and a muscle relaxer. Bernie returned to the emergency room the following day complaining of drowsiness, severe headaches, and swelling of his forehead. Bobbie said that Bernie's forehead looked like "the people on Star Trek" the morning after the accident. The hospital records reflect there was palpable swelling between the eyebrows and over the lower forehead, which was tender to touch. However, because some swelling was considered normal, no additional tests or treatments were prescribed and Bernie was sent home with instructions to recheck if his headaches continued over a week.
Three days after the accident, Bernie sought follow-up treatment for his headaches from a local physician in general practice, Dr. Thomas Givens. Dr. Givens testified that Bernie had a completely swollen head and face, a laceration on the forehead, and was unrecognizable because the skin of the forehead lapped over his eyebrows. Dr. Givens noted the forehead laceration was about an inch and a half in length, had four or five sutures in it, and was infected.[1] He gave Bernie pain medication *4 and an antibiotic and, because he was concerned about the intensity of the headaches, referred him to a neurologist, Dr. Srinivas Ganji. Dr. Ganji performed an MRI of the brain, which was normal. Dr. Givens treated Bernie for his continuing headaches and complaints of personality change for several months, after which Bernie was treated by various specialists.
During the two and one-half years before trial, Bernie was examined or treated by several psychiatrists, an endocrinologist, two neuro-psychologists, a neurologist, and an ear, nose, and throat physician; he was hospitalized five times for treatment of his mental problems. Dr. Thomas Krefft, a neurologist, testified that he began treating Bernie for headache pain on June 5, 1995. The headaches had been occurring daily and continuously and were described as a frontal pounding pain accompanied by nausea, blurred vision, and sensitivity to light and noise. Dr. Krefft concluded Bernie had post-traumatic headaches secondary to a concussion from the motor vehicle accident. Over the course of several months, Dr. Krefft experimented with different medications to try to alleviate and prevent the headaches. In October 1995, Dr. Krefft referred Bernie to an ear, nose, and throat specialist to determine why Bernie was still experiencing swelling of his forehead. A CAT scan ordered by Dr. Louis Cucinotta showed a cyst in one of the maxillary sinuses, but both doctors thought it unlikely that this had anything to do with the headaches or swelling. Dr. Krefft noted that by February 1997, Bernie was getting some relief from over-the-counter medications and from the medications being prescribed by his other treating physicians. Dr. Krefft testified he treated many head injury patients for headaches and Bernie's symptoms fit the pattern experienced by others with similar head trauma.
Dr. Marsha Redden, a clinical psychologist, began seeing Bernie and Bobbie for marriage counseling in October 1995. According to Bobbie, Bernie had completely changed, becoming paranoid, controlling, and argumentative. He complained of persistent headaches, could not deal with any stress, and was taking out his frustrations on her and the children. Bernie complained of impotence, low tolerance for frustration, mood swings, rage, suicidal thoughts, and paranoia. He felt useless because his traditional view of the family with himself as the breadwinner and Bobbie taking care of the house and children had been turned around as a result of his disabilities. After visiting with both of them several times, Dr. Redden concentrated on treating Bernie. She referred him to Dr. William Black, a neuro-psychologist, who concluded after testing Bernie that he had a mild closed head injury. This confirmed her tentative diagnosis of post-concussion syndrome and personality change due to head trauma. Dr. Redden treated Bernie and consulted with him and Bobbie frequently for a year and a half. She last saw him in January 1997, at which time Bernie was able to manage his own funds, had headaches on a less frequent basis, was better able to deal with stress, and was less irritable with Bobbie and the children.
Dr. Harold Conrad, a psychiatrist, began treating Bernie when he checked himself into Bayou Oaks Hospital in March 1996 for treatment of anxiety, irritability, and uncontrollable temper. Dr. Conrad *5 eventually met with Bernie approximately sixty times, with each visit lasting from thirty minutes to two hours. He concluded Bernie had personality change due to a closed head injury, a diagnosis which typically manifests symptoms such as instability of mood, poor impulse control, rage out of proportion to any stressor, apathy, and suspiciousness. To relieve Bernie's pain and stabilize his mental condition, many different medications were tried, some of which had an adverse effect on his sexual functioning or caused other side effects such as sleepiness or dizziness.
At the time of trial, Bernie was still taking four to six medications four times daily. Numerous diagnostic tests had been performed, but none reflected any organic brain injury. Bernie submitted evidence showing his medical expenses, including prescription medicines, totaled $44,029.04 at the time of the trial. Although his condition was somewhat stabilized with medication, there was no indication Bernie would ever be fully functional and pain-free with or without medication, and his doctors indicated his prognosis for eventual recovery was poor.
Bernie was 21 years old when the accident occurred and had been working for his employer, Cor-Val, for almost two years. His payroll records showed he consistently worked over forty hours per week at this job. A co-worker and supervisor of the back shop, Lester Claus, testified that Bernie "came in as a young feisty individual," but "grew up" at Cor-Val and became a very energetic and dependable worker. Bernie and Bobbie stated he loved his job at Cor-Val; he tried to return sometime after the accident, but could not handle the work. Ken Bergeron, an accountant for Cor-Val, stated that after the accident, Bernie was placed on disability status with the company, and was eventually terminated because he could not return to work and his disability insurance had run out. Dr. Randy Rice, an economist, estimated that if Bernie had been able to continue working, by the time of trial he would have earned $55,013. If he could never return to work in the future, he would lose $446,300 over his work-life; if he could get a job earning minimum wage, he would lose $214,165. A vocational rehabilitation counselor, Cornelius Gorman, concluded if Bernie continued to take his medications, he could be trained to work in a sheltered settinga position where he would not have a lot of contact with peopleunder close supervision.

Jury Verdict
After a four-day trial in November 1997, the jury found Angie's negligence was the sole cause of the accident and Bernie's injuries, but awarded him only $1200 for past and present physical pain and suffering, $2000 for past and present mental pain and suffering, $1000 for lost wages, and $4500 for medical expenses. The jury awarded Bobbie $2000 for loss of consortium, but denied such damages for his two pre-school children. The jury also denied any damages for future physical and mental pain and suffering, permanent disability or loss of enjoyment of life, future medical expenses, and future lost wages or earning capacity.
Because this was a jury trial, this court does not have the benefit of a judge's oral or written reasons, and the jury verdict form does not provide a space for the jury to explain why its damage awards were so low. However, there are at least two possible factual findings implicit in the jury verdict in this case. The jury may have found that Bernie was lying about the nature and extent of his disabilities to maximize his damage award. Or the jury may have determined that Bernie's current physical and mental problems were not caused by the accident, but were caused by something else, perhaps reflecting some pre-existing personality disorder or condition. Before this court can decide whether the jury's damage awards were an abuse of discretion, it must examine these possible underlying factual findings.

*6 Standard of Review

This court's review of factual findings is governed by the manifest error clearly wrong standard. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the jury's finding, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the jury's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a jury's factual finding only if, after reviewing the record in its entirety, it determines the jury's finding was clearly wrong. See Stobart v. State, through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). Even though an appellate court may feel its own evaluations and inferences are more reasonable than the fact finder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989); Stobart, 617 So.2d at 882. When findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the jury's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Rosell, 549 So.2d at 844. Where there are two permissible views of the evidence, the fact finder's choice between them cannot be manifestly erroneous or clearly wrong. Stobart, 617 So.2d at 883.

Defendants' Case
Reviewing the record, it is obvious that Bernie was less than truthful on several occasions, both before and after his accident. When he applied for the job with Cor-Val, he stated on the application that he had graduated from high school. In fact, Bernie was held back three grades because of his dismal school performance and had not even achieved his GED. Another inconsistency in Bernie's testimony concerned whether or not he lost consciousness when the accident occurred. The emergency room records showed he denied having lost consciousness. Yet he told many of his treating physicians that he had been "knocked out" for as long as five to ten minutes when the collision occurred. At trial, Bernie claimed he had been dazed and could not really remember whether he lost consciousness or not. On the medical examination portion of his job application for Cor-Val, Bernie indicated he had never been a patient in a hospital or sanitarium; in fact, his mother and stepfather had enrolled him in a mental treatment facility, Parkland Hospital in Baton Rouge (Parkland), when he was fifteen years old. He stayed there for two weeks of psychological testing and counseling, and was discharged with a diagnosis of conduct disorder and a learning disability. Bernie explained this response on the job application by stating he did not know Parkland was a hospital or sanitarium; he understood he was there for behavior and attitude problems. Bernie also omitted mention of his Parkland treatment when discussing his medical history with various physicians who treated him after the accident.
This failure to disclose the Parkland hospitalization is significant. Parkland's records from five years before the accident showed Bernie claimed to be troubled by headaches and school problems on a daily basis and frequently experienced temper outbursts. The records also reflect that Bernie was admitted because he was skipping school, making failing grades, having difficulty controlling his anger, creating family discord, and refusing to obey his mother and stepfather. Bernie told the admitting physician that he had been suspended from school at least three times for fighting, had broken one boy's nose with a *7 basketball, and had kicked another in the face. He claimed to know martial arts and stated that when he got angry, he lost control and wanted to kill someone. At trial, Bernie indicated he made up these violent incidents because he wanted to be sure no one picked on him while he was at Parkland.
His mother's statements upon his admission to Parkland were that he had been very verbally abusive to his parents and grandmother, would not obey rules, had made long-distance phone calls without permission, spent time with other young men in the neighborhood whom his mother had forbidden him to see, threw wild parties at his home when his parents were absent, had been drinking excessively, and had been lying to her about his behavior. She also said Bernie had been suspended numerous times for beating kids up at school, had been skipping school, and would be expelled if he had another suspension. At trial, she characterized all of this as the result of his running with some other boys she did not approve of, denied ever having been notified about fights at school, and indicated Bernie was much improved after his stay at Parkland. However, she admitted when he later tried to take courses for his GED, he was suspended from that program for fighting. Dr. Arthur Rosenkrantz, who treated Bernie at Parkland, testified that his ultimate diagnosis was that Bernie had a conduct disorder, solitary aggressive type, and should continue psychological counseling after leaving Parkland.
None of Bernie's treating physicians had this information from Parkland when they began treating him. All admitted their opinion concerning his diagnosis and the cause of his condition was based on the history he gave. However, several of his doctors eventually reviewed the Parkland records and did not change their opinion that his post-accident condition was fundamentally different from the condition disclosed in those records.
The defendants referred Bernie to Dr. Charles Moan, a clinical psychologist, for an independent medical examination. Dr. Moan specialized in neuro-psychology, which he described as the study of the behavioral aspects of brain damage. He indicated the cornerstone of the patient evaluation is an exhaustive history taking and a mental status examination, because unless the physician had an accurate understanding of what the patient was like in the past, he could not tell whether the current behaviors were related to anything other than the patient's past. After obtaining the complete history, the second step in the evaluation is performing a variety of tests developed to reveal brain functions such as memory, concentration, auditory processing, visual processing, and motor coordination. Dr. Moan stated the complete history, the tests, and the review of all the patient's medical records are needed to make an accurate diagnosis.
Dr. Moan spent almost two full days with Bernie in February 1997. He said there were many inconsistencies between what Bernie told him and what was reflected in his medical records. Bernie also contradicted himself from one moment to the next in relating his history. Dr. Moan noted that despite Bernie's complaints of memory loss, he was able to recall the telephone number of a friend who drove him to the doctor's office the second day.[2] Educational tests confirmed Bernie was functioning in the borderline range of intelligence, but did not show a pattern consistent with brain damage. Bernie's highest score on his IQ test was in attention and concentration, the very areas in which he often complained of having problems. Comparing his academic performance on the tests with his educational history, Dr. Moan found no differences between his pre-accident and post-accident intelligence. *8 On several tests designed to assess frontal lobe function, there was no indication that Bernie had any problem with planning, foresight, organization, concentration, immediate attention, and recall.
Dr. Moan noted that Bernie did not want to do a number of the tests or indicated before the tests were even shown to him that he could not do them. When required to take those tests, Bernie would miss the simplest items, but score correctly on the more difficult items. On other tests, his performance was so dismal that a six-year-old or advanced Alzheimer's patient could have outperformed him. To Dr. Moan, this indicated Bernie was faking the tests to look worse than he was. There were other glaring inconsistencies, such as Bernie's claimed inability to name the image of a triangle on one test, but three tests later identifying a triangle by touch, by image, and by drawing. Dr. Moan also noted that immediately upon arrival the first day, Bernie complained of being too stressed out for the meeting, but managed to stay at the office until four p.m. and complete the interviews and a battery of verbal and written tests.
On the Minnesota Multiphasic Personality Inventory (MMPI) test, Bernie's score revealed that his psychological problems were chronic and long-standing, not the result of some recent event. That test revealed he was an angry, passive/aggressive personstubborn, oppositional, and defiantjust as he had been at the age of fifteen. The MMPI also had questions designed to determine whether a person was trying to look sick, and the results indicated that Bernie endorsed some of those items at levels higher than 98 percent, which is not possible unless the person is trying to look ill. Dr. Moan concluded there was nothing in Bernie's history, nothing in the mental status exams, and nothing in all the medical records and tests to verify chronic head injury or a traumatic brain injury. Based on Bernie's prior history, Dr. Moan concluded that his early anti-social behavior had simply progressed from childhood into an adult version of the same disorders.
Cor-Val's quality assurance manager and safety coordinator, Dural Kraemer, also testified for the defense concerning Bernie's job performance. He indicated that in Bernie's personnel file, there were eight written employee warning reports for infractions of safety rules and other rules of conduct. One report said Bernie "stormed through the office" while customers were there, "raising hell and being discourteous." Another stated he refused to unload some valves after being told to do so. Another indicated he dropped off some rush parts in the wrong place, and when told to bring them somewhere else, said he did not have "blank" time and walked out, leaving the parts there and delaying the job. Several violations were for refusing to wear safety glasses, sometimes immediately after being told by his supervisor to use them for certain activities or in certain locations. Mr. Kraemer had on one occasion recommended that Bernie be dismissed, but Bernie's immediate supervisor gave him another chance.

Observations
According to the medical experts in this case, closed head trauma with chronic pain syndrome and personality change is a difficult diagnosis, because the organic brain injury may not be readily discernable. The personality symptoms can also be attributed to many other conditions, including drug or alcohol abuse, or can be very similar to problems occurring even before the traumatic incident. When there are no objective tests showing the brain injury, the doctors called upon to diagnose and treat the patient are almost wholly dependent upon an accurate patient history to assess the patient's condition.
In this case, the jury heard from a number of lay and expert witnesses who described the personality changes experienced by Bernie and who concluded these were caused by the head trauma he received in the automobile accident. However, the jury also had considerable evidence *9 that Bernie exhibited many of these same character traits before the accident. Most significantly, the jury heard numerous inconsistent statements from Bernie at trial and in the various medical histories. He admitted to lying on a job application concerning his educational status, and said he lied about fights with classmates when admitted to Parkland. Dr. Moan's tests revealed Bernie was deliberately manipulating his responses in an effort to appear sicker and more confused than he actually was. If Bernie's doctors had to base their diagnoses on his veracity, the jury could have concluded that the doctors reached erroneous conclusions because the history was incomplete or inaccurate. Accordingly, the jury in this case could have concluded that Bernie was exaggerating his symptoms or that his condition was not caused by the accident. While we do so reluctantly, we must conclude that there were two permissible views of Bernie's condition in the evidence presented to the jury. In that instance, although this court might have reached a different conclusion on the facts, the jury's choice cannot be manifestly erroneous. See Stobart, 617 So.2d at 883.

Abuse of Discretion
The trier of fact is given much discretion in the assessment of damages. LSA-C.C. art. 2324.1. Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). In reviewing an award of damages, an appellate court should not rely on a comparison of other awards in other cases to determine if a particular award is appropriate. A comparative analysis should be undertaken only after the appellate court has found an abuse of discretion, and then only for the purpose of determining the highest or lowest point which is reasonably within that discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1260 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
The difficulty in evaluating the jury's damage awards in this case is that the jury obviously believed Bernie was in an automobile accident and suffered some injuries, but did not believe Bernie's claims concerning the causation and extent of his current disabilities. Clearly, the jury did not believe Bernie's injuries were significant or were the cause of his continuing mental problems. If the jury believed that Bernie suffered only a bump on the head and some superficial lacerations and abrasions, these are the type of injuries one would generally expect to be resolved within several weeks or months, at most.
While this court cannot determine from the jury verdict exactly where the jury drew the line on the extent of Bernie's injuries, we can deduce that point by examining the awards for past medical expenses and lost wages. Using the summary of Bernie's medical expenses and compiling only the amount incurred through the end of June 1995, the total is $4,496.14. The jury awarded $4500 for Bernie's medical expenses. The jury heard testimony that Bernie earned $6.50 per hour and awarded him $1000 for lost wagesthe equivalent of one month's wages. Therefore, we conclude the jury limited its consideration of Bernie's damages to what might reasonably be expected as follow-up treatment for a mild closed head injury with no long-term complications.
Based on this implicit finding, we are unable to say that the jury's awards were an abuse of its discretion. For physical and mental pain and suffering, the jury awarded a total of $3,200a reasonable amount for minimal injuries that persist only a few weeks or months. Similarly, the jury's award of $2000 to Bobbie for her loss of consortium during the same period is reasonable, as is the denial of any loss of consortium damages for the two very young children. Furthermore, if the jury concluded, as they must have, that Bernie's injuries did not persist *10 beyond a few months, there was no basis for an award of damages for future mental or physical pain and suffering, future loss of wages or earning capacity, or future medical expenses.
Because we have concluded the jury had sufficient evidence to decide that the nature and extent of Bernie's injuries was less than he claimed, and because the amounts awarded are consistent with that assessment, we cannot say the jury abused its discretion in this case.

CONCLUSION
The judgment of the trial court is affirmed. All costs of this appeal are assessed against Bernie and Bobble Metrejean.
AFFIRMED.
KUHN, J., dissents believing the damage assessment is abusively low.
NOTES
[1] This anomaly concerning the presence of sutures in Bernie's forehead laceration was never clarified, and this lingering discrepancy in the medical records colored the entire case. The emergency room physician, Dr. Ann Lozes, did not have any independent recollection of the incident, but testified from the hospital records that no stitches were needed. Dr. Givens, on the other hand, stated there were sutures present when he first saw Bernie three days after the accident. Dr. Givens said there were occasions when emergency room records were incomplete. Bernie said he could not recall when or by whom the stitches were put in, but said, "It took me almost a year to grow the hair back where they shaved it." None of the other witnesses shed any light on whether a laceration on Bernie's head required sutures as a result of the accident.
[2] Dr. Moan was also impressed with Bernie's ability to locate his office and drive there on his own the first day. But later rebuttal testimony revealed that, in fact, someone else drove Bernie to the doctor's office on both days.