845 So.2d 528 (2003)
Mario F. SACCO, Individually, and on Behalf of Michael C. Sacco, Deceased
v.
Don R. ALLRED, Midland Risk Insurance Company, Terry A. Boudreaux, Paul A. Picou, the Town of Golden Meadow, Louisiana, the Town of Golden Meadow, Louisiana Police Department, and Chief of Police, Ray Adams, Golden Meadow Police, Ex Officio.
No. 2002 CA 0141.
Court of Appeal of Louisiana, First Circuit.
February 19, 2003.
*531 Gerald J. Nielsen, Metairie, for Defendants/Appellants, Town of Golden Meadow and Paul A. Picou.
Scott R. Bickford, New Orleans, for Plaintiff/Appellee, Mario F. Sacco.
Before: CARTER, C.J., WHIPPLE, and CIACCIO,[1] JJ.
CARTER, C.J.
Near midnight on March 8, 1996, Don R. Allred, who was driving Terry A. Boudreaux's car, lost control of the vehicle in a curve on Louisiana Highway 1 in Lafourche Parish. The car flipped over and landed in a canal. Boudreaux and Michael C. Sacco were passengers in the car. Sacco drowned as a result of the accident.
Earlier that evening, at approximately 10:45, Officer Paul Picou of the Golden Meadow Police Department (GMPD) stopped the same vehicle about a block from the Golden Meadow Town Hall. Picou took the three men to Town Hall, where he determined that Boudreaux was too intoxicated to drive. He ticketed Boudreaux for reckless operation of a motor vehicle and driving left of center. Boudreaux told Picou that Allred had not been drinking. According to Picou, Allred showed no sign of impaired faculties. He was coherent, with no slurred speech, and steady on his feet. Allred told Picou he had a valid driver's license, but it was not in his possession. Picou called the Louisiana State Police and asked for a check of Allred's license, but due to computer problems, the State Police was unable to obtain that information for him. Picou allowed the three men to leave Town Hall in Boudreaux's vehicle, with Allred at the wheel, at approximately 11:10 p.m. The accident occurred roughly 45 minutes later.
Sacco's father, Mario F. Sacco (plaintiff), sued Picou; the GMPD; Ray Adams, chief of the GMPD; the town of Golden Meadow (Golden Meadow); Allred; Boudreaux; and Midland Risk Insurance Company, which provided liability insurance to Boudreaux and to Allred, as a permissive user of Boudreaux's car. After a bench trial, judgment was rendered in favor of defendants and against plaintiff, dismissing plaintiff's suit against all defendants. Plaintiff moved for a new trial, which was granted. After the hearing on the new trial, the trial court reversed itself, rendering judgment in favor of plaintiff for $50,000.00 in compensatory damages and $2,037.80 in special damages.[2] The court *532 also awarded plaintiff $25,000.00 in exemplary damages against Allred. The court assigned fault 50% to Allred and 50% to Picou and his employer, Golden Meadow.
Picou and Golden Meadow (defendants) appeal, contending that Picou's conduct was reasonable and that alternatively the trial court erred in failing to find Sacco was negligent for choosing to ride in the vehicle with Allred driving. Plaintiff answered the appeal, seeking an increase in damages.

TRIAL COURT'S FINDINGS

No-DWI-arrest policy
The trial court's written reasons in this case are somewhat confusing. The court expressed its concern and displeasure about Golden Meadow's policy of arresting for reckless operation of a motor vehicle (ROMV) instead of driving while intoxicated (DWI)[3] in its written reasons:
As in all professions where the exercise of discretion is part of daily operations, there is a fine line between the exercise of reasonable discretion and malfeasance or gross negligence. When suffering and death result from the actions or inactions of those exercising the discretion, the inquiry is more pointed and the degree of tolerance shrinks. In this day of heightened awareness of the dangers of drinking and driving, which attitude was just as acute in 1996, it is almost inconceivable that any law enforcement agency could purposely and consistently look away from the crime of driving while intoxicated. True, the officers in Golden Meadow were charged with taking the intoxicated driver from behind the wheel or, in some remote circumstances, towing *533 and impounding the vehicle. However, the mere fact that there is a policy, a planned system of denial, makes any situation arising out of a case in that town ripe for blame and punishment, for the town and its officials who continue to support such a policy in the name of discretion, social policy, and economic concerns. (Emphasis added.)
After a lengthy discussion about the town's policy, however, the court stated: "[T]he liability issues in this case do not arise out of the policy not to arrest drunk drivers." We agree. Whether Boudreaux was arrested for DWI or ticketed for ROMV was not determinative of whether defendants breached a duty to Michael Sacco.
Failure to ascertain whether Allred had a valid license
The trial court also discussed at length Picou's decision to allow Allred to drive Boudreaux's vehicle without a valid driver's license in his possession, although he stated in written reasons that the "liability issues in this case do not arise out of ... the actions of Officer Picou in permitting Allred to drive the Boudreaux vehicle away from the Town Hall." The court noted that Louisiana Revised Statute 32:667 A(4) sets forth rules for releasing a vehicle to another driver when the original driver is arrested for DWI. That statute provides in pertinent part:
If the vehicle is operable and a passenger in the vehicle who is not under the influence of alcohol has a valid driver's license, the officer shall allow the passenger to take control of the vehicle and shall not order or procure towing services for the vehicle. If the vehicle does not create a hazard or obstruction to traffic and the motoring public, and if there is no passenger in the vehicle who possesses a valid driver's license and who is not under the influence of alcohol, the officer, before ordering or procuring towing services, shall allow the arrestee a reasonable time and opportunity to contact another person to take possession or control of the vehicle on behalf of the arrestee. Reasonable time to notify and take possession of the vehicle shall be in the sole discretion of the officer.
The statute also provides immunity for an agency that allows another person to take control of the vehicle on the arrestee's behalf:
However, the law enforcement agency, the law enforcement officer, the state, and the political subdivision shall not be liable for damages, injuries, or deaths occasioned by the vehicle not being towed immediately or by another person taking possession or control of the vehicle on behalf of the arrestee.
The trial court found that the immunity provision did not apply because there was no DWI arrest.
But despite finding the statute was inapplicable, the court held that the provisions of section 667 A(4) regarding release of a vehicle should be the standard for all Louisiana police officers. The court found that Picou had a clearly defined, non-discretionary duty to release the car only to a licensed driver who was in possession of his license, and that Picou's breach of this duty was a cause-in-fact of the accident: "[H]ad he applied the driver's license requirement... no one would have driven the vehicle away from Town Hall that night, and there would not have been an accident."
The liability of a police officer is determined using the duty/risk analysis. Mathieu v. Imperial Toy Corp., 94-0952, p. 4 (La.11/30/94), 646 So.2d 318, 321. For a plaintiff to recover, he must prove the defendant had a duty to conform his conduct to a specific standard of care; he *534 failed to conform his conduct to that standard; that substandard conduct was a cause-in-fact of the injury, the substandard conduct was a legal cause of the injury; and damages. Each inquiry must be answered affirmatively. Id. at 322.
Although Picou's failure to ascertain whether Allred had a valid driver's license may have been a cause-in-fact of the accident, i.e., but for Picou allowing Allred to drive, the accident would not have occurred, Picou's action was not a legal cause. A police officer has a duty to protect the motoring public from the unreasonable risk of harm caused by drivers who are unlicensed because they are untrained or those who have had their driving privileges revoked because they committed offenses such as driving while intoxicated. State Trooper Scott Stagg testified Allred's Illinois driver's license had been suspended. Allred testified that he had licenses in the past in Mississippi, Illinois, and Florida. Obviously he had passed driver's licensing tests and obtained a driver's license, so he was not untrained. Allred testified his Illinois license was suspended for having no proof of insurance. Plaintiff presented no evidence to contradict that testimony. We cannot simply assume that the Illinois suspension had any bearing on his ability to drive.

Was Allred impaired while at Town Hall?
The trial court found it more probable than not that Allred's failure to maintain control of his vehicle, likely due to his intoxication, caused the accident. The evidence supports the trial court's finding that Allred's impairment and failure to maintain control of his vehicle caused the accident. At 3:57 on the morning after the accident, Allred's blood alcohol level was.01. Two experts, William J. George, a professor of pharmacology and director of toxicology at Tulane Medical School, and Gerald Liuzza, a board-certified forensic pathologist who teaches at LSU Medical School, attempted to calculate Allred's blood-alcohol content at the time of the accident. Liuzza "back extrapolated," assuming that Allred's last drink was at 10:40 that evening. Liuzza emphasized that the calculations were imprecise because of differences in individual elimination rates, characterizing them as "a broad, general, ballpark approximation." Liuzza calculated that if Allred's last drink was at 10:40 p.m., his blood-alcohol content at the time of the accident was between .05 and .11, with an average or mid-range of.07. Using a slightly different elimination rate, George calculated that the rate ranged from .0655 to .0715, with a midrange of .068. However, Liuzza testified it was possible for Allred to reach a blood-alcohol content of .07 by drinking three or four shots of hard liquor and three or four beers during the 30-minute period before the accident.
Plaintiff contends Allred was impaired when Picou allowed him to drive away from Town Hall. Three officers were present during the time Allred, Sacco, and Boudreaux were at Town Hall, and all three testified Allred appeared sober. Picou testified Allred was coherent, his speech was not slurred, and he walked with a steady gait. Picou stated Boudreaux told him Allred had not been drinking.
Troy A. Dufrene, a Harbor Police officer, noticed three civilians when riding past Town Hall at about 11:00 on the night of the accident. He stopped to see if Picou needed help. At one point he testified he was there with the three men for 15 to 25 minutes; he also testified the three men were in Town Hall 20 to 30 minutes after he arrived. He heard Allred tell Picou he *535 had had nothing to drink, and heard Boudreaux give Allred permission to drive his car. Dufrene described Allred as "the babysitter" who tried to keep Sacco and Boudreaux quiet and out of trouble. He overheard Allred's conversation with Sacco and Boudreaux and found it to be rational and unimpaired.
Chet Louviere, a Lafourche Parish Sheriff's deputy, was off duty and in his personal car when he saw Picou stop Boudreaux. He stopped and watched Picou issue a traffic citation to Boudreaux, then followed Picou to Town Hall. He overhead Picou interrogate the three men in an attempt to determine if one of them could drive. Allred appeared to be sober. He was steady on his feet and spoke clearly. Louviere asked Allred to breathe directly in his face so he could check for the odor of alcohol. Allred complied without hesitation. Louviere testified he smelled no alcohol. He personally felt there was no problem with permitting Allred to drive. He walked the three men to Boudreaux's car and noticed no problems with Allred's gait.
Defendants contend Allred became intoxicated after leaving Town Hall. The only evidence regarding the activities of the three men during the evening before the accident is the generally unreliable testimony of Allred and Boudreaux. Allred testified he drank nothing, before or after the traffic stop, but that testimony is belied by the first blood-alcohol test. Boudreaux testified that on the night of the accident he, Allred and Sacco went to a bar in Fourchon and two bars in Grand Isle. He stated they were asked to leave all three bars because Sacco, who was drunk, made passes at the female bartenders. His testimony was equivocal as to how much Allred drank; he admitted he paid less attention to those around him because he was drunk. Boudreaux stated the final bar they visited that evening was in Golden Meadow "right by the floodgate" and just past Jack's Motel. He stated that bar was not the bar called Caroline's. Boudreaux denied stopping at any bars after leaving Town Hall but stated they drank beer that was in the car.
Priscilla Griffin offered the only other testimony regarding the three men's activities that night. Griffin was the bartender at a bar called The Lights, which was formerly known as Caroline's. She testified they arrived some time between 10:30 p.m. and 11:30 p.m. and were the only customers in her bar that night. When they arrived, Allred seemed "pretty straight" and conversed with her, but Sacco and Boudreaux were obviously drunk. They did not stay long, but each of the three had three or four shots with beer chasers before leaving the bar shortly before midnight. She remembered them well because of Allred's height[4] and the $100.00 tip they gave her. She also recalled that she wanted to close the bar at midnight and encouraged them to leave so she could shut down. She also thought of them immediately the next morning when she learned of the accident.
The trial court found that, based on the testimony of Picou, Dufrene, and Stagg, and considering the police logs, it was more probable than not that the three men visited The Lights bar before they were stopped at 10:45 p.m. by Officer Picou. But the testimony of these officers and the logs tell us nothing about the men's whereabouts before the accident. We know only that they were stopped by Picou at approximately *536 10:45 p.m., left Town Hall about 11:10 p.m., and were involved in the accident at 11:55 p.m., approximately 45 minutes later. Stagg's testimony does nothing more than establish the approximate time of the accident, based on when he was dispatched to the scene. Picou's log shows that the traffic stop ended at 11:10 p.m. Picou had no other entry until 1:50 a.m., and he testified he has no idea what went on during that time period. Dufrene's log shows that he left Town Hall at 11:40 p.m., but he testified he visited with Picou for a few minutes after the three men left. Of the evidence mentioned by the trial courtthe officer's testimony and the police logsthe only evidence that remotely supports the factual finding is Officer Dufrene's log showing he left at 11:40 p.m. But his testimony reflects that he arrived at 11:00 p.m. and was with the three men somewhere between 15 and 30 minutes.
A factual finding may be reversed only if the trial court is manifestly erroneous. Theriot v. Lasseigne, 93-2661, p. 5 (La.7/5/94), 640 So.2d 1305, 1310. The standard of appellate review of factual findings is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the trial court's finding, and 2) the appellate court must further determine the record establishes the finding is not clearly wrong (manifestly erroneous). Id. We need not reach the second part of the test in this case as we find no reasonable factual basis in the record to support the trial court's conclusion that the three men visited the bar where Griffin worked prior to their encounter with Picou. Boudreaux testified the bar he went to before the traffic stop was not Caroline's. Griffin's testimony was unequivocal that the men left her bar just before midnight. According to the joint stipulations, the trip from Town Hall to the accident scene takes 17 minutes when driving at the legal speed limit. According to Picou, The Lights bar is two minutes from Town Hall. The men obviously did not drive straight from Town Hall to the accident scene, despite Allred's testimony that he did so. Boudreaux testified they drove around Golden Meadow looking for the home of some girl he knew. He also testified, however, that his memory is impaired.
Having found that the trial court erred in finding that the three men visited The Lights before being stopped by Officer Picou and that their last drink was at 10:40, we must determine de novo whether plaintiff proved that it was more likely than not that Allred was impaired while at Town Hall.
As stated above, Boudreaux was very equivocal as to the amount Allred drank prior to the traffic stoop, while Allred denied drinking at all. The only other evidence as to Allred's condition at the time of the traffic stop is the testimony of the three officers, Picou, Dufrene, and Louviere, all of whom testified that Allred appeared sober. While it is likely that Allred had drunk alcohol at some point during the evening preceding the traffic stop, we find plaintiff failed to prove Allred was impaired while at Town Hall.

POLICE OFFICERS' STANDARD OF CARE
A police officer, in carrying out his authority to enforce laws, has a duty to perform his function with due regard for the safety of all citizens who will be affected by his action. Hardy v. Bowie, 98-2821, p. 12 (La.9/8/99), 744 So.2d 606, 614. He must act reasonably to protect life and limb, to refrain from causing injury or harm, and to exercise respect and concern for the well being of those he is employed *537 to protect. Syrie v. Schilhab, 96-1027, p. 5 (La.5/20/97), 693 So.2d 1173, 1177; Lavine v. Jackson, 97-2804, p. 5 (La.App. 1 Cir. 12/28/98), 730 So.2d 958, 962, writ denied, 99-0898 (La.5/28/99), 743 So.2d 677, cert. denied, 528 U.S. 973, 120 S.Ct. 417, 145 L.Ed.2d 326 (1999).
The reasonableness of an officer's actions depends on the totality of the facts and circumstances of each case. Mathieu v. Imperial Toy Corp., 646 So.2d at 322; Lavine, 730 So.2d at 962. The scope of an officer's duty to act reasonably under the circumstances does not extend so far as to require that the officer always choose the best or even a better method. Thus, in considering whether an officer breached his duty, the court's task is not to determine whether the officer should have acted differently or if there were better options available, but only to determine whether his actions were reasonable under the totality of the circumstances. Syrie, 693 So.2d at 1177; Mathieu, 646 So.2d at 325; Lavine, 730 So.2d at 962. The existence of other available alternative methods does not, in and of itself, render the method chosen unreasonable. Officers are not required to exercise superhuman judgment but should be able to rely on their training and common sense. Mathieu, 646 So.2d at 325 n. 12.
Plaintiff contends Picou was negligent in failing to administer a field-sobriety test to Allred. Plaintiff seeks to impose a universal duty on police officers to administer a field-sobriety test before allowing a passenger to drive when the officer determines that the driver is impaired, whether the passenger appears impaired or not. Liuzza testified that a properly administered field-sobriety test could detect alcohol impairment that was not otherwise observable. He stated that a positive lateral-gaze nystagmus test might be the "only clue" that someone was under the influence of alcohol. George J. Armbruster, Jr., who testified as an expert in police procedures, agreed with Liuzza that a field-sobriety test would give indications of intoxication that could not be seen upon casual observation. He stated the test is particularly useful in evaluating persons who are alcohol tolerant.
Armbruster further testified, however, that an officer should administer a field-sobriety test only if he has reason to suspect the person he is dealing with is intoxicated. He opined that, based on the evidence he had reviewed, at no point were Picou's suspicions raised to the point that he thought Allred might be impaired. While Picou had the authority to administer a full-battery field-sobriety test to Allred, according to Armbruster, Picou had no obligation to do so because Allred did not appear intoxicated or otherwise impaired.
The trial court held that Picou should have suspected Allred of being intoxicated and should have conducted a field-sobriety test. While conducting a field-sobriety test might have been a better thing to do, the scope of Picou's duty to act reasonably under the circumstances did not extend so far as to require that he choose the best or even a better method. After reviewing all the evidence, we find that Picou acted reasonably in light of the totality of circumstances in this case. We thus reverse the portion of the trial court's judgment assigning 50% fault to Picou and Golden Meadow, amend the judgment to cast Allred with 100% fault, and render judgment dismissing plaintiff's claims against Picou and Golden Meadow. Because of this finding, we pretermit discussion of defendants' remaining assignments of error.

ANSWER TO APPEAL
Plaintiff answered the appeal seeking an increase in general damages. The trial *538 court declined to award survival damages to plaintiff and awarded $50,000.00 in general damages for wrongful death. Plaintiff contends that Sacco was "conscious to some degree" following the accident and that the trial court was manifestly erroneous in failing to award survival damages. Plaintiff further contends that $50,000.00 is an unreasonably low sum to award for wrongful death.

Survival damages
A trial court may award damages for pain and suffering in a survival action where there is the smallest amount of evidence of pain, however brief, on the part of the deceased, based on his actions or otherwise. Factors to be considered in assessing quantum for pain and suffering are the severity and the duration thereof. The survival action permits recovery only for damages actually suffered by the deceased from the time of injury to the moment of death, including pain and suffering, loss of earnings, and any other damages sustained before death. Samuel v. Baton Rouge Gen. Med. Ctr., 99-1148, p. 4 (La.App. 1 Cir. 10/2/00), 798 So.2d 126, 129. Where there is no indication that a decedent consciously suffered, an award for pre-death pain and suffering should be denied. Id.; Pierre v. Lallie Kemp Charity Hosp., 515 So.2d 614, 619 (La.App. 1 Cir.), writ denied, 515 So.2d 1111 (La.1987).
Whether the decedent actually suffered is a factual issue to be reviewed under the manifest-error standard. Etcher v. Neumann, 00-2282, p. 16 (La.App. 1 Cir. 12/28/01), 806 So.2d 826, 840, writ denied, 02-0905 (La.5/31/02), 817 So.2d 105; Samuel, 798 So.2d at 130. The two-part test for the appellate review of a factual finding is: 1) whether there is a reasonable factual basis in the record for the finding of the trial court, and 2) whether the record further establishes that the finding is not manifestly erroneous. Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Thus, if there is no reasonable factual basis in the record for the trial court's finding, no additional inquiry is necessary. However, if a reasonable factual basis exists, an appellate court may set aside a trial court's factual finding only if, after reviewing the record in its entirety, it determines the trial court's finding was clearly wrong. See Stobart v. State, 617 So.2d 880, 882 (La.1993).
Sacco's blood-alcohol content at the time of the accident, as determined by autopsy, was .225. Boudreaux testified that he was the first person out of the car when it landed in the canal. Sacco was unconscious in the back seat, lying down with his whole body in the water. He tried to get Sacco out of the back seat, but both Sacco's door and seatbelt were stuck. He then got Allred out. Allred helped him get the back door and Sacco's seatbelt unstuck and pull Sacco up the bank of the canal. Sacco had no pulse at first, but Allred performed CPR on Sacco, and Sacco started breathingor "gargling," as Boudreaux described it. Boudreaux testified Sacco was never conscious; he never spoke or exhibited any reactions with his eyes.
Allred testified he gave Sacco CPR in the backseat of the car, while still in the water. He said Sacco coughed up some water, and he propped Sacco up so he would not fall back into the water. He went out a window of the car and then with Boudreaux's help got the car door open and got Sacco out. He testified that during the 20 to 30 minutes before help arrived, Sacco was breathing.
Harbor Policeman Randy J. Chiasson was the first law enforcement officer to arrive at the scene. He testified that Sacco was "kind of breathing" and "gasping *539 for air." He described Sacco as "semi-conscious" because "his eyes kept opening and staying closed for a certain amount of time."
Wayne J. Bourg, a certified paramedic, arrived at the scene at 12:20 a.m., approximately 25 minutes after the accident. He testified Sacco was unresponsive, had no pulse, and was not breathing when he arrived. Sacco's medical records from Lady of the Sea General Hospital show Sacco had no pulse, blood pressure, or respiration when he arrived, his skin was icy cold and pale, and his pupils were fixed and dilated. Dr. William W. Crenshaw, the family doctor who pronounced Sacco dead at Lady of the Sea, testified Sacco had a large laceration to his right frontal area, there was nothing to indicate Sacco was alive when he saw him, and he "certainly could have been dead at the scene."
After considering all the evidence, we find that a reasonable factual basis exists for the trial court's finding that Sacco did not consciously suffer as a result of the accident and that this finding was not clearly wrong.

Wrongful-death damages
Plaintiff contends the wrongful death damages awarded by the trial court are inadequate. Much discretion is left to the trial judge in the assessment of general damages. LSA-C.C. art. 2324.1; Metrejean v. Prudential Ins. Co., 98-2170, p. 12 (La.App. 1 Cir. 11/5/99), 761 So.2d 1, 9. The correct standard for appellate review of a damage award is clear abuse of discretion. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1340 (La.1993). That discretion is vast and should rarely be disturbed unless it is, in either direction, beyond that which a reasonable trier of fact could assess under the particular circumstances. Hae Woo Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Sacco was 37 years old at the time of his death. Plaintiff, Sacco's father, lived in Pensacola, Florida. Sacco moved from Pensacola to Louisiana to work in the oil fields about five years before his death. He would work a month or so and then have a week off, and he returned to Pensacola approximately once a month. Sacco had gotten into trouble a few times because of his drinking, and he had to return to Pensacola every 30 days because he was on probation. He would ride a bus to Pensacola, and his father or brother would pick him up at the bus station and take him to a motel. Sacco stayed in a motel while in Florida because he often had rowdy friends with him who liked to party all night, and plaintiff had to get up early for work.
During the week that he was home each month, Sacco would visit his father two or three times. He would do his laundry at plaintiff's house, and sometimes they went shopping or went out to eat. Plaintiff testified he and his son had a good relationship. Sacco's younger brother Mark testified that four years after the accident his father was still affected by Sacco's death.
While $50,000.00 for the loss of a major son with whom a parent had a good relationship may be on the low side, we do not find that it was an abuse of the trial court's vast discretion.

CONCLUSION
For the foregoing reasons, we reverse the portion of the trial court's judgment that finds Picou and Golden Meadow were 50% at fault. We amend that portion of the trial court judgment to assess 100% fault to Don Allred. We hereby render judgment in favor of Picou and Golden Meadow, dismissing plaintiff's demands *540 against them at plaintiff's costs. We also affirm the portion of the judgment that declines to award survival damages and assesses general damages for wrongful death at $50,000.00.[5] All costs of this appeal are assessed to plaintiff.
REVERSED IN PART, AMENDED IN PART, AFFIRMED IN PART, AND RENDERED.
NOTES
[1] Hon. Phillip Ciaccio, retired, is serving as judge pro tempore by special appointment of the Louisiana Supreme Court.
[2] The judgment was rendered in favor of plaintiff but did not name the defendants. In their answer, Golden Meadow and Picou appeared and stated they were "redundantly named within the Petition as the Town of Golden Meadow, the Town of Golden Meadow Police Department, and the Chief of Police in his official capacity."
[3] Chief Adams testified that policy was in effect when he became employed by the GMPD in 1976 and was still in effect as of the date of trial. Adams testified there are two main reasons for this policy. First, the GMPD has only three police officers; they work solo shifts. A DWI arrest would take the town's only officer off the street for a considerable period of time. The officer would have to take the accused to the parish courthouse in Thibodaux because Golden Meadow cannot prosecute for DWI.

The other reason is financial. According to Adams, Golden Meadow cannot afford to buy an intoxilyzer, keep it calibrated; and send its officers for training in its use. The trial court implied in written reasons that the town has a financial incentive to prosecute for ROMV instead of DWI because fines for ROMV tickets pad the Golden Meadow treasury, whereas it receives no financial benefit from a DWI prosecution by the parish. Joint stipulations at the trial, however, showed that the town receives the insignificant sum of approximately $1,200.00 per year from ROMV tickets with "alcohol involvement." (The parties stipulated that from 1995 to 1997, GMPD issued 28 citations for ROMV with the notation that alcohol was involved. The town receives $130.00 from each ticket.)
George J. Armbruster, Jr., testified as defendants' expert in police procedures. Armbruster stated that when an officer encounters a drunken driver, his primary responsibility is to "get the drunk off the road." There are many ways to accomplish that objective. Arrest for DWI would be the preferred course of action if departmental policy allowed it. Armbruster testified that during his four and one-half years teaching at the Regional Police Academy, he taught students from small police departments that had policies against making DWI arrests. He taught those students to keep the impaired person off the highway while following departmental policy. Under questioning by the trial judge, Armbruster stated:
[T]he officer, in my opinion, is obligated to take some action to make sure that person does not operate that vehicle again if he believes that person is impaired.... [T]he safety of life and limb is his primary concern at that time. How he accomplishes that may take place in different ways.
[4] Griffin testified that because of her own height, 6', she tends to notice tall men. Allred is 6'9" tall.
[5] The award of $25,000.00 in exemplary damages was not appealed and is thus final.